EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Orlando José Aponte Rosario; Hon. Rafael Hernández Montañez; Hon. José Varela Fernández; Hon. Ángel R. Matos García; Hon. Carlos A. Bianchi Angleró; Hon. Jesús Manuel Ortiz; Hon. Ramón Luis Cruz Burgos; Carlos Rodolfo Colón Rosario; Leslie Ramos Rodríguez<br><br>Peticionarios<br><br>v.<br><br>Presidente Comisión Estatal de Elecciones; Estado Libre Asociado de Puerto Rico<br><br>Recurridos<br>_____<br><br>Hon. Luis Ricardo Vega Ramos en su carácter personal y como representante a la Cámara de Representantes del Estado Libre Asociado de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Presidente Comisión Estatal de Elecciones; Estado Libre Asociado de Puerto Rico<br><br>Recurridos | 2020 TSPR 119<br><br>205 DPR _____ |

Número del Caso:  MD-2020-2
                  cons. con
                  MD-2020-5


Fecha:  5 de octubre de 2020


Abogados de la parte peticionaria:

    Lcdo. Lucas Córdova Ayuso
    Lcdo. Alberto C. Rivera Ramos
    Lcdo. Orlando José Aponte Rosario


Abogado de la parte recurrida:

    Lcdo. Félix R. Passalaqua Rivera


Abogado del Hon. Luis Vega Ramos:

    Lcdo. Ricardo Arrillaga Armendáriz

Oficina del Procurador General:

    Lcdo. Isaías Sánchez Báez
    Procurador General

    Lcdo. Pedro A. Vázquez Montijo
    Subprocurador General

    Lcdo. Carlos Lugo Fiol


Abogados de los *Amicus Curiae:*


    Lcdo. Eudaldo Báez Galib
    Lcdo. Gregorio Igartua De la Rosa
    Lcdo. Eliezer Aldarondo Ortiz
    Lcda. Rosa Campos Silva
    Lcdo. Eliezer Aldarondo López
    Lcdo. Carlos J. Sagardía Abreu
    Lcdo. Antonio A. Hernández Almodóvar
    Lcda. Veronica Ferraiuoli Hornedo



Materia: Derecho Constitucional - No se puede aprobar legislación que altere sustancialmente la relación política de Puerto Rico con Estados Unidos sin que previamente haya obtenido la aprobación de los puertorriqueños a ese curso de acción. La Asamblea Legislativa tiene la facultad de escoger mecanismos legítimos para adelantar su objetivo y registrar la expresión del pueblo; la sabiduría o conveniencia de esa determinación legislativa es una cuestión política no justiciable. Por lo tanto, conforme al mandato del pueblo, en los plebiscitos de 2012 y 2017, el Subcapítulo VII-B de la Ley Núm. 58 de 20 de junio de 2020, conocida como Código Electoral de Puerto Rico de 2020 y la Ley Núm. 51 del 16 de mayo de 2020, conocida como la Ley para la Definición Final del Estatus Político de Puerto Rico tienen un fin público conforme al Sec. 9 del Art. VI de la Constitución de Puerto Rico.



Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Orlando José Aponte Rosario;
Hon. Rafael Hernández
Montañez; Hon. José Varela
Fernández; Hon. Ángel R.
Matos García; Hon. Carlos A.
Bianchi Angleró; Hon. Jesús
Manuel Ortiz; Hon. Ramón
Luis Cruz Burgos; Carlos
Rodolfo Colón Rosario;
Leslie Ramos Rodríguez

    Peticionarios

    v.

Presidente Comisión Estatal
de Elecciones; Estado Libre
Asociado de Puerto Rico

    Recurridos

_____

Hon. Luis Ricardo Vega Ramos
en su carácter personal y
como representante a la
Cámara de Representantes del
Estado Libre Asociado de
Puerto Rico

    Peticionario

    v.

Presidente Comisión Estatal
de Elecciones; Estado Libre
Asociado de Puerto Rico

    Recurridos

MD-2020-002

cons. con

MD-2020-005

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 5 de octubre de 2020.

Veinte años después de nuestra decisión en Báez Galib y otros v. C.E.E. II, 152 DPR 382, 393 (2000) (Báez Galib

II), nos corresponde determinar si, según los criterios esbozados en esa Opinión, la Ley Núm. 51-2020 y el Subcapítulo VIII-B de la Ley Núm. 58-2020 son constitucionales. Luego de evaluar ambas leyes y las disposiciones de la Constitución de Puerto Rico, resolvemos que las leyes en controversia son constitucionales.

Hoy resolvemos lo siguiente:

• Reafirmamos nuestro precedente en Báez Galib II, y, por lo tanto, tenemos jurisdicción original para atender el recurso de mandamus sobre la constitucionalidad del Subcapítulo VIII-B de la Ley Núm. 58-2020, que trata sobre el voto presidencial. Por su parte, la Ley Núm. 51-2020 confiere jurisdicción y competencia original a este Tribunal para atender cualquier impugnación a esa ley.

• El pleito está maduro para su adjudicación ya que se trata de dos eventos concretamente definidos, con fecha cierta y promulgados válidamente por la Asamblea Legislativa.

• Estos casos consolidados presentan interrogantes constitucionales sobre el fin público de dos eventos electorales promulgados por la Asamblea Legislativa, ante el mandato que dio el pueblo puertorriqueño.

• El pueblo de Puerto Rico ostenta el poder de expresarse para ejercer su derecho a la autodeterminación.

- A través de la aprobación de la Ley Núm. 51-2020 y el Subcapítulo VIII-B de la Ley Núm. 58-2020, se hace valer la expresión sobre la autodeterminación de los puertorriqueños.

- La elección de noviembre de 2020 para solicitar la admisión de Puerto Rico como estado de la Unión, es consecuencia directa del mandato electoral que el pueblo dio en los plebiscitos de 2012 y 2017. En el primero, el pueblo votó en contra de continuar con la condición actual de territorio. La participación electoral en esa votación fue de 78% del electorado hábil, mayor a la que aprobó en 1952 la Constitución del Estado Libre Asociado con un 58% de los electores inscritos. En una segunda pregunta, los electores expresaron su preferencia por la estadidad. En el segundo plebiscito en 2017, aunque participaron menos electores, la estadidad volvió a ser la fórmula ganadora.

- El resultado de la consulta de 2017 requirió expresamente a la Asamblea Legislativa establecer un proceso dirigido a adelantar la admisión de Puerto Rico como estado de la Unión y, expresamente, a aprobar legislación para una elección local por el Presidente y Vicepresidente de Estados Unidos.

- Los estados se crean por sí mismos, utilizando los mecanismos que entiendan convenientes. No los crea el Congreso.

- Históricamente se ha demostrado que no hay un proceso único o uniforme para la admisión como estado. Tampoco depende de una sola votación ni hace falta vinculación previa del Congreso.

- Como establecimos en P.I.P. v. C.E.E., infra, y reafirmamos en Báez Galib II, la Constitución es neutral en materia de estatus político y no cierra la puerta a la autodeterminación del pueblo de Puerto Rico.

- El plebiscito de 3 de noviembre de 2020 no es discriminatorio. Todo elector puede expresarse libremente. Los que favorecen la estadidad para Puerto Rico pueden votar "sí" y los que no la favorecen pueden votar "no". Quienes afirman que el plebiscito no es neutral o que es discriminatorio pasan por alto el efecto legal de las consultas de 2012 y 2017. Allí, los electores dieron un mandato a la Asamblea Legislativa para implementar el resultado de aquellas votaciones. La decisión legislativa de cómo poner en vigor ese mandato electoral merece deferencia. No se puede invocar el principio de neutralidad para frustrar la voluntad del pueblo. Eso diferencia estos casos consolidados de la situación que existía en 2000, cuando decidimos Báez Galib II. Entonces no había un mandato del pueblo; hoy sí lo hay.

- Lo que sí es discriminatorio y no es neutral es tomar al voto por una alternativa y sumarle el número de los electores que no votaron. Eso altera la expresión en las

urnas e invariablemente concede una ventaja a la condición política existente, pues diluye la expresión por las alternativas de cambio. Esa teoría hace la decisión de no votar equivalente a la de votar por una alternativa específica. Eso sería contrario a la voluntad de quien decidió no votar. Por eso, hemos rechazado esa interpretación. <u>Suárez Cáceres v. Com. Estatal Elecciones</u>, infra.

- Eso demuestra que tanto votar como no votar tiene consecuencias. Los que votaron en 2012 y 2017 establecieron un mandato al gobierno, al expresar su voluntad. Esa expresión popular constituye, por definición, un fin público. En cambio, los que no votaron, optaron por delegar la decisión a los ciudadanos que sí emitieron un voto en las urnas.

- La Asamblea Legislativa obedeció el mandato que los electores emitieron en los plebiscitos de 2012 y 2017. Allí se llevó a cabo un proceso de autodeterminación y la fórmula de estadidad obtuvo la mayoría de los votos emitidos.

- Existe un fin público en la legislación aprobada por mandato de los electores de Puerto Rico, para ejercer su derecho de autodeterminación.

- El fin público de la Ley Núm. 58-2020 surge no solo de las aspiraciones que el pueblo de Puerto Rico expresó en el Preámbulo de la Constitución del Estado Libre

Asociado, sino más recientemente, del mandato electoral dado en el plebiscito de 2017.

- Debemos ser deferentes con las actuaciones de las otras ramas de gobierno, siempre que estén enmarcadas dentro del esquema constitucional y aunque como magistrados discrepemos personalmente de su bondad o sabiduría.

Exponemos a continuación los fundamentos de Derecho para llegar a estas conclusiones.

I

El señor Orlando José Aponte Rosario, el señor Carlos Rodolfo Colón Rosario, la señora Leslie Ramos Rodríguez y varios Representantes del Partido Popular Democrático (en adelante, "peticionarios") presentaron una solicitud de mandamus, en jurisdicción original del Tribunal Supremo, en el caso MD-2020-0002, contra el Presidente de la Comisión Estatal de Elecciones (CEE). En síntesis, los peticionarios alegan que el cumplimiento del Subcapítulo VII-B de la Ley Núm. 58 de 20 de junio de 2020, conocida como Código Electoral de Puerto Rico de 2020 (Ley Núm. 58-2020), y la Ley Núm. 51 del 16 de mayo de 2020, conocida como la "Ley para la Definición Final del Estatus Político de Puerto Rico" (Ley Núm. 51-2020), infringe un deber ministerial de mayor jerarquía: el impuesto por la Sec. 9 del Art. VI de la Constitución de Puerto Rico, que requiere a todo funcionario público la obligación de utilizar fondos públicos para fines públicos. Por lo tanto, sostienen que la CEE y sus funcionarios tienen el

deber ministerial de abstenerse de utilizar recursos públicos para un propósito que se aparte de la finalidad pública que la Constitución exige.

Los peticionarios alegan que las leyes pretenden "implementar ficticiamente un derecho legal inexistente y perseguir el objetivo de alterar la relación de poder entre Puerto Rico y Estados Unidos, sin que el pueblo lo haya autorizado" y, por tanto, violentan el Art. II, Sec. 19 de la Constitución de Puerto Rico, LPRA, Tomo 1. De igual forma, alegan que las referidas leyes, "al perseguir objetivos constitucionalmente ilegítimos, al asignar fondos públicos y autorizar el uso de recursos públicos, viola la Sec. 9 del Art. VI de nuestra Constitución". Según los peticionarios, "solo persiguen adelantar la causa de la estadidad, por lo que viola el principio de igualdad económica electoral inmerso en la Sec. 9 del Art. VI de la Constitución de Puerto Rico". Solicitud de *mandamus*, MD-2020-0002, pág. 14.

Como fundamento, los peticionarios adoptaron las expresiones de la Carta que la Oficina del Secretario de Justicia de Estados Unidos le envió al Presidente de la CEE, en la cual se indicó la posición de la Rama Ejecutiva federal con relación a la solicitud de fondos que se hizo al amparo de la Ley Núm. 51-2020. La solicitud se amparó en la asignación congresional de $2.5 millones para "la educación objetiva y no partidista de los votantes sobre las opciones que resolverían el futuro estatus político de Puerto Rico" (traducida así en la Exposición de Motivos de

la Ley Núm. 51-2020). Consolidated Appropriations Act of 2014, Pub. L. No. 113-76, 128 Stat. 5, 61 (2014) ("*$2,500,000 is for objective, nonpartisan voter education about, and a plebiscite on, options that would resolve Puerto Rico's future political status, which shall be provided to the State Elections Commission of Puerto Rico*".). En particular, los peticionarios argumentan -amparados en la carta de la Oficina del Secretario de Justicia- que "[l]a papeleta Estadidad Sí o No, es conflictiva con el juicio de política pública de los Estados Unidos de que el pueblo de Puerto Rico no ha rechazado definitivamente el Estado Libre Asociado (ELA)". Íd. pág. 8. De igual manera, alegan que la Ley Núm. 51-2020 promueve una sola fórmula de estatus político (la estadidad). Argumentan que esto riñe con la política pública del gobierno federal de mantener una neutralidad sobre el tema del estatus político de Puerto Rico para que sean, precisamente, los puertorriqueños quienes determinen su preferencia entre las opciones de estatus político de la Isla que no sean incompatibles con la Constitución federal. Íd.

Ante la cercanía de la consulta electoral, acogimos el recurso y ordenamos que en un término improrrogable de diez (10) días los peticionarios presentaran sus alegatos, y transcurrido ese término, concedimos diez (10) días adicionales para que la parte recurrida y cualquier parte interesada presentara sus alegatos. Antes de que vencieran estos términos, el Representante del Partido Popular

Democrático, Hon. Luis Vega Ramos, presentó una segunda Solicitud de mandamus y sentencia declaratoria (MD-2020-0005). En síntesis, planteó los mismos argumentos que los peticionarios en el caso MD-2020-0002. En vista de ello decidimos consolidar los recursos.

Por su parte, el Presidente de la CEE presentó su alegato. Señaló que los peticionarios pretenden impugnar la legalidad de un trámite programado para 2024 y que, al presente, no está en controversia su aplicación. Además, adujo que la presente controversia trata de un asunto que se diferencia completamente de lo resuelto en Báez Galib II, pues en ese caso no se prohibió el voto presidencial, sino que se condicionó a la existencia de un fin público. Asimismo, indicó que Báez Galib II estableció que no era válida una votación que solo promoviera la opción de la estadidad, pues en aquel momento, el pueblo de Puerto Rico no había autorizado esa alternativa de estatus y, por tanto, esta no podía favorecerse.

Además, compareció el Gobierno de Puerto Rico, representado por la Oficina del Procurador General. Sostuvo que la Ley Núm. 51-2020 persigue un fin público y es neutral porque establece un plebiscito no discriminatorio que permite al pueblo de Puerto Rico expresarse sobre la relación política entre Puerto Rico y los Estados Unidos. Planteó que esta ley provee igual oportunidad a todas las personas hábiles para votar en Puerto Rico de expresar su acuerdo o desacuerdo con la alternativa de estadidad. Añadió que la decisión de

celebrar un plebiscito "Estadidad Sí o No" debe ser objeto de amplia deferencia ya que se trata de una actuación razonable de política pública promulgada por las ramas políticas de gobierno. Además, sostuvo que la actuación legislativa está respaldada por un mandato electoral, esto es, los resultados de las consultas plebiscitarias de los años 2012 y 2017.

En cuanto al Subcapítulo VII-B de la Ley Núm. 58-2020, el Gobierno planteó que el voto presidencial que allí se autoriza es un instrumento legítimo para hacer valer el derecho de reparación de agravios por la "condición de inferioridad injustificable, por motivo de su origen nacional y el estatus de Puerto Rico como territorio no incorporado". Alegato del Gobierno de Puerto Rico, pág. 3. Según el Gobierno, "[e]l que pueda o no tener "consecuencia práctica" o efecto inmediato por parte del gobierno federal no es un criterio constitucionalmente apropiado para determinar si la elección presidencial tiene un fin público". Íd.

También comparecieron el Lcdo. Eudaldo Báez Galib, el Lcdo. Gregorio Igartúa De la Rosa, el Senado de Puerto Rico, el Partido Nuevo Progresista y la Hon. Jennifer A. González Colón como amigos de la corte. Con el beneficio de la comparecencia de las partes y de los amigos de la corte, atendemos los recursos consolidados de epígrafe, sin trámite ulterior, como nos autoriza la Regla 50 del Reglamento de este Tribunal, 4 LPRA Ap. XXI-B.

II

Como asunto de umbral, debemos discutir la jurisdicción original de este Tribunal para atender la impugnación de la consulta de estatus pautada por la Ley Núm. 51-2020 y la elección presidencial dispuesta en el Subcapítulo VII-B de la Ley Núm. 58-2020.

La Sec. 5 del Art. V de la Constitución de Puerto Rico, Tomo 1 LPRA, dispone que "[e]l Tribunal Supremo, cada una de sus salas, así como cualquiera de sus jueces, podrán conocer en primera instancia de recursos de hábeas corpus **y de aquellos otros recursos y causas que se determinen por ley**" (Énfasis suplido). Por su parte, el Art. 8.3(a) de la Ley Núm. 51-2020 establece:

> Toda controversia, demanda, litigio o impugnación relacionada con esta Ley que sea ventilada en un tribunal de justicia, se tramitará y considerará bajos los términos y las condiciones dispuestas en el Código Electoral de Puerto Rico. **Cuando alguna impugnación, controversia o acción legal plantee directamente, o conlleve en alguna de sus consecuencias, la paralización de los procesos conducentes a la celebración del plebiscito en la fecha y horario dispuestos por esta Ley, será considerada y resuelta directamente por el Tribunal Supremo de Puerto Rico.**

Adviértase que la Ley Núm. 51-2020, supra, establece que el Tribunal Supremo tiene la jurisdicción y competencia exclusiva para atender cualquier recurso como este, en el que se solicita que el referéndum de estatus no se celebre. Se trata de un mecanismo especial creado por ley, análogo al de sentencia declaratoria de la Regla 59.1 de Procedimiento Civil, 32 LPRA Ap. V, pero para que sea este Foro -y no el Tribunal de Primera Instancia-

quien lo atienda y adjudique lo que corresponda. En otras palabras, somos el único tribunal en el sistema local de justicia que puede atender la impugnación a la Ley Núm. 51-2020 y, por eso, nos toca resolver y emitir mediante Sentencia lo que proceda, en los méritos.[1]

Por otra parte, al considerar la impugnación de la Ley Núm. 58-2020, puntualizamos que la Ley de la Judicatura reconoce la jurisdicción de este Foro para atender en primera instancia un recurso de mandamus. Art. 3.002 de la Ley Núm. 201-2003, según enmendada, conocida como la Ley de la Judicatura de 2003, 4 LPRA sec. 24s.

Además, el Art. 649 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3421, establece:

> El auto de mandamus es un auto altamente privilegiado dictado por el Tribunal Supremo del Estado Libre Asociado, o por el Tribunal de Primera Instancia de Puerto Rico … dirigido a alguna persona o personas naturales, a una corporación o a un tribunal judicial de inferior categoría dentro de su jurisdicción requiriéndoles para el cumplimiento de algún acto que en dicho auto se exprese y que esté dentro de sus atribuciones o deberes. Dicho auto no confiere nueva autoridad y la parte a quien obliga deberá tener la facultad de poder cumplirlo.

Así pues, el mandamus es el recurso para requerirle a un funcionario el cumplimiento de un acto que la ley le

---

[1] En Vamos, Concertación Ciudadana, Inc. v. Commonwealth of Puerto Rico, Civil No. 20-1426(FAB), el Tribunal de Estados Unidos para el Distrito de Puerto Rico declaró inconstitucional la aplicación de esta sección de la Ley Núm. 51-2020 para impedir la presentación de demandas de interdicto en ese tribunal, por violación de derechos civiles. Opinion and Order, 24 de septiembre de 2020. Eso en nada altera la asignación de jurisdicción y competencia original que la ley hace a este Tribunal, para litigios locales relacionados con ese estatuto.

ordena, cuando ese deber no admite discreción en su ejercicio. Por lo tanto, el requisito primordial es que se trate de un deber ministerial impuesto por ley. Además, el mandamus solo debe expedirse cuando el peticionario carece de "un recurso adecuado y eficaz en el curso ordinario de la ley". Art. 651 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3423.

Los peticionarios sostienen que tenemos jurisdicción original para atender el recurso y ordenar a la CEE que cumpla con su deber ministerial, impuesto por la Sec. 9 del Art. VI de la Constitución de Puerto Rico. Este requiere a todo funcionario público que utilice los fondos públicos solamente para fines públicos. Al respecto, en Báez Galib II, supra, pág. 393, resolvimos que "el recurso de mandamus permite exigir que un funcionario no acate o cumpla con una ley o actuación gubernamental cuando su cumplimiento quebranta un deber ministerial de superior jerarquía, como lo sería un deber ministerial impuesto por la Constitución del Estado Libre Asociado". Además, expresamos que, el Presidente de la CEE y sus funcionarios, como funcionarios públicos que tienen que adherirse a lo que se dispone en nuestras leyes y Constitución, están sujetos al auto de mandamus. Íd., pág. 392.

No cabe duda de que el Presidente de la CEE tiene el deber ministerial de actuar conforme a derecho. Véase, Art. 3.2 de la Ley Núm. 58-2020. El Art. 3.8 de esa ley reconoce que el Presidente de la CEE es la máxima

autoridad ejecutiva y administrativa de la Comisión y que es responsable de los procesos y los eventos electorales. Asimismo, el Art. 8.3.b establece que "corresponderá al Presidente de la Comisión tomar las medidas necesarias, y con la mayor rapidez, para garantizar el cumplimiento cabal de esta Ley". Por lo tanto, según el precedente de Báez Galib II, se justifica expedir un auto de mandamus si la parte peticionaria demuestra que las actuaciones de un funcionario infringen alguna disposición de la Constitución.

En vista de todo lo anterior, por disposición expresa de la Ley Núm. 51-2020, por un lado y por otro, en cuanto a la Ley Núm. 58-2020, ateniéndonos al precedente de Báez Galib II, resolvemos que tenemos jurisdicción original para atender los casos ante nos. Con esto presente, nos toca evaluar la constitucionalidad de ambas leyes al amparo de la Constitución de Puerto Rico. Es decir, resolvemos por fundamentos locales independientes al derecho constitucional federal.

III

Nos corresponde atender los señalamientos de los peticionarios sobre la inconstitucionalidad de la Ley Núm. 51-2020. Estos son: (1) la celebración de la consulta que ordena la Ley Núm. 51-2020 depende de que se desembolsen fondos federales, lo que se negó por virtud de la Carta de la Oficina del Secretario de Justicia federal, (2) la Asamblea Legislativa pretende alterar la relación entre Puerto Rico y Estados Unidos sin la aprobación del pueblo,

(3) la Ley Núm. 51-2020 viola la Sección 9 del Artículo 6 de la Constitución de Puerto Rico, ya que carece de un fin público y, (4) la Ley Núm. 51-2020 violenta el principio de igualdad electoral.

### A. Ley Núm. 51-2020

El 16 de mayo de 2020, la Gobernadora de Puerto Rico, Hon. Wanda Vázquez Garced, firmó la Ley Núm. 51-2020, que dispone la celebración de una consulta de estatus político el próximo 3 de noviembre de 2020, día de las elecciones generales en la Isla. Conforme a la Exposición de Motivos de la precitada ley, esta fue aprobada para

> disponer las reglas para la celebración de un plebiscito el 3 de noviembre de 2020 que solucione el centenario problema de Puerto Rico como territorio de Estados Unidos de América; garantizar a los ciudadanos americanos de Puerto Rico el ejercicio de su derecho a la autodeterminación y su derecho a requerir del Gobierno federal la reparación de agravios" disponer las condiciones para que este plebiscito se realice conforme a la Ley Pública 113-76 de 2014 y los informes congresionales relacionados H.R. Report 113-171 y H.R. Report 116-101; asignar fondos; y para otros fines relacionados. Véase Exposición de Motivos de la Ley para la Definición Final del Estatus Político de Puerto Rico, Ley Núm. 51-2020, pág. 1.

Por su parte, el Art. 1.3(d) de la Ley Núm. 51-2020, establece como Declaración de Política Pública que "[las] expresiones en ambos plebiscitos son recientes, están vigentes y nunca han sido revocadas electoralmente. El reclamo de igualdad de deberes y derechos como ciudadanos americanos con la estadidad, por lo tanto, **constituye un**

**mandato electoral del pueblo soberano y conforma la política pública vigente en Puerto Rico"**.

El inciso (e) añade:

[A] partir del rechazo electoral en el reciente Plebiscito de 2012 a la actual condición territorial, los ciudadanos americanos de Puerto Rico padecen las desigualdades y las desventajas de esa condición a pesar de su rechazo y autodeterminación. Ese agravio contradice los valores de democracia e igualdad de nuestra Nación; agravio inaceptable que exige la más pronta reparación. Art. 1.3(e) Ley Núm. 51-2020.

La declaración de política pública concluye con el inciso (i), que establece que "**el propósito del plebiscito aquí dispuesto es ratificar y hacer valer la voluntad electoral expresada por la mayoría de los ciudadanos americanos de Puerto Rico** en los recientes Plebiscitos de 2012 y 2017". Art. 1.3(i) Ley Núm. 51-2020. Así, conforme al texto de la ley, el electorado puertorriqueño tendrá la oportunidad de contestar con un "Sí" o un "No" si desea que Puerto Rico se convierta en un estado de Estados Unidos de América. Art. 4.1 de la Ley Núm. 51-2020.

Además, la ley reconoce que en caso de resultar favorecida la alternativa del "Sí", deberá comenzar un proceso de transición. A estos efectos, la legislación establece lo siguiente:

El proceso de transición será liderado por la Gobernadora y la Comisionada Residente de Puerto Rico, quienes serán quienes representen a la isla en cualquier asunto o negociación relacionado a un "Plan de Transición". No más tarde de los treinta (30) días a partir de la certificación de los resultados del plebiscito, la Gobernadora y la Comisionada Residente, con el consejo de la Comisión de la Igualdad, redactarán el Plan de Transición, debidamente

calendarizado para hacer valer la expresión democrática y mayoritaria de autodeterminación del pueblo de Puerto Rico. El Plan de Transición será entregado a los líderes del Congreso de ambos partidos políticos nacionales y al Presidente de Estados Unidos con el propósito de establecer los procesos de transición con la urgencia que reclaman los ciudadanos de Puerto Rico.

La Comisionada Residente de Puerto Rico en Washington, DC, presentará la legislación federal correspondiente y la Comisión de Igualdad abogará por su aprobación en el Congreso. Art. 4.3 de la Ley Núm. 51-2020.

Como vemos, la propia ley reconoce que el hecho de que el "Sí" prevalezca no quiere decir que automáticamente se vaya a admitir a Puerto Rico como estado de la Unión. Lo que dispone la ley es un mandato a los funcionarios territoriales a que promulguen e impulsen un proceso de transición en el Congreso Federal.

**(i)    La celebración de la consulta de estatus político no depende de la asignación de fondos federales.**

El Art. 8.1 de la Ley Núm. 51-2020, atiende la asignación de fondos para la celebración de este evento. Este establece:

(a) La Gobernadora, el Director Ejecutivo de la Oficina de Gerencia y Presupuesto (OGP), el Secretario de Hacienda y el Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico, tienen el deber ministerial de priorizar, identificar y **hacer disponibles los recursos económicos estatales aquí asignados para cumplir con todos los propósitos de esta Ley y conforme al calendario dispuesto en esta, haya o no disponibles asignaciones federales para el plebiscito.**
. . .
(c) Por virtud de la Sección 402 de la Ley Pública 114-187 (2016), conocida como "*Puerto Rico Oversight, Management, and Economic Stability Act*'' (PROMESA)", los recursos económicos estatales requeridos para el cumplimiento de esta Ley quedan totalmente

excluidos de los alcances y las disposiciones de esa Ley federal y de cualquier objeción de su Junta de Supervisión Fiscal.

Como vemos, el legislador proveyó mecanismos para salvaguardar y garantizar el derecho de los electores en caso de que no se desembolsaran los fondos federales solicitados. La carta de la Oficina del Secretario de Justicia de los Estados Unidos solo tiene el efecto de no autorizar el desembolso de fondos federales para la consulta y es totalmente inconsecuente para otro fin.

Asimismo, el Art. 8.5 de la Ley Núm. 51-2020 dispone:

> En caso de surgir alguna omisión, desacuerdo o incumplimiento relacionados con esta Ley o con la implementación de la Ley Pública 113-76 (2014), **quedan ordenados por esta Ley los remedios y los recursos económicos propios del Gobierno de Puerto Rico que sean necesarios para así proteger los derechos de los ciudadanos americanos de Puerto Rico a votar libre, voluntaria y democráticamente en este plebiscito**, según los requiera el Presidente de la Comisión Estatal de Elecciones de Puerto Rico. La anterior, constituye una obligación ministerial del Presidente de la Comisión. Art. 8.5 de la Ley Núm. 51-2020 (Énfasis suplido).

Es decir, la celebración del plebiscito solo depende de la voluntad del territorio y no de la autorización congresional. Esta se requiere solamente para utilizar los $2.5 millones que el Congreso aprobó para "la educación objetiva y no partidista de los votantes sobre las opciones que resolverían el futuro estatus político de Puerto Rico". *Consolidated Appropriations Act of 2014*, <u>supra</u>. Véanse, además, H.R. Report 113-171; H.R. Report 116-101.

**(ii)  La Asamblea Legislativa actuó conforme al mandato del pueblo en los plebiscitos de 2012 y 2017.**

El 23 de julio de 1967 fue la primera ocasión en la que se consultó al electorado puertorriqueño sobre su preferencia de estatus, después de la adopción de la Constitución en 1952. F. Bayrón Toro, Historia de las elecciones y los partidos políticos de Puerto Rico (1809-2012), 8va ed. Rev., Publicaciones Gaviota, 2016, págs. 442-443. En aquella ocasión, la fórmula del Estado Libre Asociado prevaleció con un 60.4% del voto emitido. La fórmula de la estadidad, por su parte, obtuvo un 39.00%, mientras que la independencia obtuvo un 0.06% del respaldo del electorado. Íd. Este plebiscito contó con la participación del 62% del electorado hábil. Íd.

Veinte seis (26) años después se volvió a consultar al pueblo. En 1993, prevaleció la fórmula del Estado Libre Asociado, con el favor del 48.6% del electorado. La estadidad creció con un 46.3% del respaldo del electorado y la independencia obtuvo un 4.4%. Íd. En este evento participó el 73.5% del electorado hábil. Íd.

Cinco años después, en 1998, el 50.3% del electorado escogió la opción de "ninguna de las anteriores" que aparecía en la papeleta. La estadidad mantuvo un 46.5% de apoyo, la independencia obtuvo el favor de un 2.5% del electorado, la libre asociación obtuvo un 0.3% de los votos y la opción de permanecer como territorio solo tuvo el aval del 0.1% de los votantes. Íd. En este plebiscito participó el 71.3% del electorado hábil. Íd.

Transcurridos catorce (14) años desde la última consulta, el pueblo puertorriqueño contestó dos preguntas en noviembre de 2012. Primero se preguntó: "¿Estás de acuerdo con mantener la condición política territorial actual?" En esa ocasión, el 53.97% del electorado contestó "No". Por otra parte, un 46.03% contestó que "Sí". Si contestaba que no a la primera pregunta se hacía una segunda pregunta, en la cual el electorado tenía la oportunidad de escoger entre tres opciones de estatus: (1) la estadidad, (2) un llamado estado libre asociado soberano, o (3) la independencia. La estadidad obtuvo el 61.16% de los votos emitidos mientras que el denominado estado libre asociado soberano y la independencia obtuvieron un 33.34% y 5.49%, respectivamente.[2] En este plebiscito participó el 78.19% del electorado hábil. Íd. Más recientemente, en 2017, el pueblo escogió por segunda ocasión la estadidad, con un 97.18% de los votos depositados. La libre asociación o independencia obtuvo un 1.5%, y el territorio fue favorecido por tan solo un 1.32% de los votos. Participó solamente el 23.23% de los electores hábiles.[3]

---

[2] Comisión Estatal de Elecciones, Consulta sobre el estatus político de Puerto Rico, 2012, http://168.62.166.179/eg2012/REYDI_Escrutinio/index.html#es/default/CONDICION_POLITICA_TERRITORIAL_ACTUAL_ISLA.xml (última visita, 5 de octubre de 2020).

[3] Comisión Estatal de Elecciones, "Plebiscito para la descolonización inmediata de Puerto Rico: Escrutinio", 2017, http://resultados2017.ceepur.org/Escrutinio_General_79/index.html#es/default/CONSULTA_DE_ESTATUS_Resumen.xml (última visita, 5 de octubre de 2020).

Como podemos ver, después de refrendar al Estado Libre Asociado en dos ocasiones (por mayoría en 1967 y por pluralidad en 1993), el pueblo rechazó en 2012 dar su aval a la condición territorial actual y, en cambio, escogió la estadidad como su fórmula preferida de estatus. Lo mismo hizo el pueblo en 2017, cuando reiteró su apoyo a la fórmula de la estadidad. Tom C.W. Lin, Americans, Almost and Forgotten, 107 Calif. L. Rev. 1249, 1289 (2019). En cada una de las mencionadas consultas, el pueblo emitió un mandato. Del mismo modo en que se respetó el mandato del pueblo en 1967, 1993 y 1998, debemos respetar el mandato de autodeterminación y voluntad de cambio que el pueblo emitió en 2012 y 2017. No podemos ser selectivos al aceptar la voluntad del pueblo.

Los peticionarios alegan que los resultados de las consultas de 2012 y 2017 no constituyen un mandato del pueblo a favor de la estadidad. Sostienen, en el caso de la consulta de 2012, que en la segunda pregunta para escoger entre las fórmulas políticas de estatus, se dejaron 515,115 papeletas en blanco. Véase, Sol. de mandamus, MD-2020-0002, pág. 7 (citando la comunicación de la Oficina del Secretario de Justicia federal al Presidente de la CEE). Respecto a la consulta de 2017, argumentan que como el ejecutivo federal no aprobó las definiciones de cada fórmula de estatus y porque la participación de electores en el último plebiscito fue más baja que en ocasiones anteriores, se le debe restar

validez al resultado. Íd. Este argumento no tiene base que lo sustente.

Los peticionarios pretenden adjudicarles un significado o preferencia a las papeletas depositadas en blanco. La Constitución de Puerto Rico señala expresamente que "[l]as leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Const. PR, Art. II, Sec. 2, LPRA, Tomo I. En Suárez Cáceres v. Com. Estatal Elecciones, 176 DPR 31 (2009), explicamos que el derecho al voto "comprende no sólo la prerrogativa de un ciudadano de votar por… las opciones de su predilección, sino el derecho de acudir a la urna y depositar la papeleta en blanco o dañarla, si ese es su deseo o empeño". Íd., págs. 70-71. Añadimos que la razonabilidad y el sentido común nos obligan a concluir que "el elector que voluntariamente daña su papeleta, la deposita en blanco o vota por algún personaje ficticio, tuvo la clara intención de no favorecer ninguna opción o candidato de los que se encontraban en la papeleta". Íd., pág. 72. "No obstante, tal voto [en blanco] de ninguna manera puede ser contado para efectos de influir o afectar el resultado de una elección, **referéndum o plebiscito**, entre otros eventos electorales." (Énfasis suplido). Íd., págs. 73-74. Aclaramos entonces que lo único que podríamos interpretar con relación a ese elector es "lo que no quiere —esto es, no favorecer lo que está en la papeleta— **pero no tenemos**

**base alguna para interpretar lo que sí quiere, a no ser, simplemente, ejercer su derecho a expresarse**". Íd., pág. 72. (Énfasis suplido).

La decisión de realizar una consulta es prerrogativa de las ramas políticas del gobierno. Ante esa decisión, el elector tiene la opción de votar por las alternativas propuestas, o en cambio, de no participar, ya sea depositando en blanco su papeleta o absteniéndose de votar. Puede que un elector no participe en una elección porque no le gustan las alternativas propuestas. Puede ser, en cambio, que otro elector no crea que sea apropiado expresarse en ese momento, por las circunstancias imperantes o porque no tiene información suficiente para decidirse. Finalmente, un elector puede abstenerse de expresar su preferencia porque no tiene ninguna o por la sencilla razón de que el tema no le interesa; le da lo mismo cuál opción prevalezca. Ante tantas explicaciones posibles, no podemos atribuirle a todos los que no participaron la intención de llevar a cabo un acto de protesta, como pretenden los peticionarios. Lo único claro, entonces, es que no podemos adscribirle motivos. Cualquier interpretación sería especular acerca de la intención del elector.

"[E]s particularmente nocivo y contrario al mandato constitucional de neutralidad inyectar un elemento totalmente subjetivo y especulativo en la adjudicación de los votos". Suárez Cáceres v. Com. Estatal Elecciones, supra, pág. 91. (Martínez Torres, J., Opinión de

conformidad, a la cual se unieron Rivera Pérez, J. y Pabón Charneco, J.). La adjudicación de las papeletas en blanco como si fueran votos en contra de la fórmula ganadora amplía de manera artificial el universo electoral y diluye la proporción de votos válidos emitidos por las fórmulas en contienda. Íd. Esto dificulta e impide que se verifique en el escrutinio el mandato mayoritario y le concede una ventaja electoral indebida a la condición territorial actual, pues a los votos a favor en los plebiscitos de 2012 y 2017 le suma los votos en blanco como si fueran lo mismo que un voto por el territorio. Es decir "la inercia concedería ventaja solamente a la condición existente, que prevalecería vigente al frustrarse por un escrutinio engañoso la voluntad mayoritaria de cambio". Íd. Ese favoritismo es contrario al principio de neutralidad de la Constitución en materia de estatus político.

Por lo tanto, lo justo es que, en todo evento electoral, quienes finalmente elijan sean aquellos ciudadanos cuya intención clara e inequívoca fue votar por una de las alternativas presentadas en la papeleta. Suárez Cáceres v. Com. Estatal Elecciones, supra, pág. 73. Por consiguiente, no podemos utilizar la decisión voluntaria de los votantes que no participaron para precisamente ir en contra de la expresión popular. Lo único que podemos concluir es que quien no votó o depositó su papeleta en blanco dejó la decisión en manos de quien sí participó.

Por otro lado, los peticionarios argumentan que la consulta de 2017 no constituye un mandato del pueblo a

favor de la estadidad porque solo participó el 23.23% del electorado hábil para votar y que las fórmulas de estatus contenidas en la consulta no fueron previamente autorizadas por el Congreso. No le asiste la razón.

En nuestro sistema electoral la validez de un resultado electoral no está condicionada a que participen una cantidad o porcentaje específico de electores. Es totalmente contrario a nuestra tradición democrática imponer esa condición. Más aun, en 1952 **solo el 58% del electorado hábil** participó en el Referéndum de Aceptación de la Constitución del Estado Libre Asociado. Bayrón Toro, op. cit., págs. 442-443. La abstención del 42% del electorado no le quitó validez. Pero, independientemente de eso, los peticionarios omiten que, en 2012, el 53.97% de los votantes (970,910 electores) contestó que no a la pregunta "¿Estás de acuerdo con mantener la condición política territorial actual?". En ese plebiscito **participó el 78.19% del electorado hábil**.[4] En conclusión, hubo más participación electoral en 2012 para rechazar el ELA que en 1952 para aceptarlo.

De hecho, en nuestra tradición electoral se ha enmendado la Constitución solo con la participación de un 35% de los electores hábiles. Íd. En 1970, el pueblo puertorriqueño enmendó la Constitución para otorgar a los

---

[4] Véase Comisión Estatal de Elecciones, Consulta sobre el estatus político de Puerto Rico, 2012, http://168.62.166.179/eg2012/REYDI_Escrutinio/index.html#es/default/CONDICION_POLITICA_TERRITORIAL_ACTUAL_ISLA.xml (última visita, 5 de octubre de 2020).

jóvenes de 18 años el derecho al voto. La enmienda fue refrendada por el pueblo con una mínima participación del 35% del electorado. Íd. Si adoptáramos el argumento de los peticionarios, ese mandato sería inválido por la escasa participación de los electores inscritos y los jóvenes de 18 años no tendrían derecho a votar en las próximas elecciones. ¿Acaso un 35% de los electores inscritos es una participación adecuada y un 23.23% no? ¿Dónde se tira la raya? Así de ilógico es lo que los peticionarios nos invitan a hacer con la consulta de 2017.

**(iii) La Ley Núm. 51-2020 tiene un fin público, consistente con lo que se dispone en el Art. VI, Sec. 9 de la Constitución de Puerto Rico.**

El Art. VI, Sec. 9 de la Constitución de Puerto Rico, ordena que "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". Hemos reconocido que la noción de finalidad pública juega un papel muy importante en nuestro ordenamiento jurídico. Báez Galib II, supra, pág. 395. (citando a P.I.P. v. C.E.E., 120 DPR 580, 606 (1988)). Esta limita la capacidad de actuar del Estado, pues se trata de un análisis indispensable en todo proceso de erogación de fondos públicos. Es decir, "la búsqueda de un fin de interés público es la condición positiva de toda actuación estatal". P.I.P. v. C.E.E., supra, pág. 606.

En P.P.D. v. Gobernador I, 139 DPR 643, 686 (1995), discutimos el concepto de "fin público". Allí expresamos:

El concepto de "fin público" **no es uno estático y sí uno ligado al bienestar general que tiene que ceñirse a las cambiantes condiciones sociales** de una comunidad específica, a los problemas peculiares que éstas crean **y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad compleja.** (Énfasis suplido).

Asimismo, reconocimos que la determinación inicial de los poderes políticos en torno a lo que constituye un fin público merece gran deferencia. En McCormick v. Marrero, Juez, 64 DPR 260, 267 (1944), reconocimos que la Asamblea Legislativa "tiene amplia discreción para determinar qué es lo que constituye un fin público y para tomar aquellas medidas que a su juicio promuevan el bienestar de la comunidad". Añadimos que "[n]o es función de los tribunales la de expresar opinión sobre la sabiduría o conveniencia de una medida legislativa". Íd.

Cónsono con esto, en P.I.P. v. C.E.E., supra, pág. 611, afirmamos que

al ejercer nuestras prerrogativas constitucionales de juzgar la validez jurídica de las actuaciones de las otras ramas de gobierno con relación al uso de fondos del erario para fines considerados como públicos, **"los tribunales debemos actuar con prudencia y deferencia a la voluntad legislativa, siempre que la misma esté enmarcada dentro del esquema constitucional y aunque como magistrados discrepemos personalmente de la bondad de los actos legislativos".** (Énfasis suplido).

Como vemos, la Asamblea Legislativa posee una amplia discreción a los efectos de determinar lo que constituye un fin público. De ordinario, validaremos esa determinación a menos que sea manifiestamente arbitraria e incorrecta. Asoc. Ctrl. Acc. C. Maracaibo v. Cardona, 144

DPR 1 (1997). Así lo reconocimos cuando expresamos lo siguiente:

> Por ser las Asambleas Legislativas de los Estados democráticos los cuerpos donde maduran y toman forma las fuerzas sociales latentes u operantes, y donde sólo es posible definir con la necesaria precisión la mayor parte de los elementos que componen y constituyen el llamado fin o interés público, **las opciones del legislador en este campo son amplias, siempre y cuando éste se mueva dentro del marco de la Constitución.** P.I.P. v. C.E.E., supra, págs. 607-608. (Énfasis suplido).

Claro está, como aclaramos en Báez Galib II, supra, pág. 396, esto "no significa que los tribunales debemos renunciar a ejercer nuestra facultad constitucional de evaluar si determinado uso de propiedad o fondos del Estado por parte de la Legislatura y el Ejecutivo constituye un uso para un fin público".

Para resolver a favor de los peticionarios tendríamos que ignorar el mandato que el pueblo emitió en las urnas para que se adelante el cambio de estatus hacia la estadidad federada. Confundiría la política pública que el pueblo expresó dos veces en las urnas y sería una intromisión con la decisión legislativa legítima de adelantar el proceso consultando al pueblo para que ratifique o rechace su apoyo a la estadidad. **A diferencia del año 2000, cuando resolvimos Báez Galib II, hoy existe un mandato electoral del pueblo para la descolonización de Puerto Rico mediante la admisión del territorio como estado de la Unión, y a favor de toda gestión legal que adelante esos fines.** Por consiguiente, es válido que se consulte al pueblo acerca de la ratificación e

implementación de su más reciente expresión. Esa es una decisión legislativa de política pública con la que no podemos intervenir.

Por otra parte, en P.I.P. v. C.E.E., supra, pág. 626, dijimos:

> La mera posibilidad de que la publicidad y celebración de las primarias [presidenciales] pueda tener un efecto adverso sobre los intereses ideológicos o políticos del demandante no es suficiente para establecer la inconstitucionalidad de la ley, así como tampoco impide el uso de fondos del Estado en una actividad que la Legislatura determinó que estaba revestida de interés público.

Por lo tanto, los efectos adversos sobre los intereses ideológicos o políticos de los peticionarios no son suficientes para sostener la impugnación de las leyes en disputa, pues la decisión legislativa merece deferencia.

Se plantea también que la consulta de estatus político no es válida porque no hay un compromiso previo del Congreso para atenderla e implementar la voluntad del pueblo de Puerto Rico. Como veremos a continuación, esta objeción tampoco tiene méritos.

### a Métodos para obtener la admisión como estado federado

Desde su génesis, Estados Unidos de América fue concebida como una nación creciente y abierta a nuevos integrantes. En el Federalista Núm. 14, James Madison dejó claro que la Constitución no solo cumple con ese fin expansionista, sino que reconoce el derecho a la autodeterminación que tienen los ciudadanos de los territorios que deseen ser parte de la Unión:

> [E]l objeto inmediato de la Constitución federal es asegurar la unión de los trece estados primitivos, cosa que sabemos que es factible, **y sumar a éstos los otros Estados que pueden surgir de su propio seno, o en su vecindad, lo que no hay razón para dudar que sea igualmente viable.** Los arreglos indispensables por lo que se refiere a esos ángulos y fracciones de nuestro territorio situados en la frontera noroeste, **deben dejarse para aquellos a quienes la experiencia y los futuros descubrimientos pondrán al nivel de esa tarea.** A. Hamilton, J. Madison y J. Jay, El Federalista o La Nueva Constitución, (G.R. Velasco, trad.), México, Fondo de Cultura Económica, 1943, pág. 55. (Énfasis suplido).

Así, acorde con esa visión de apertura, en el Art. IV, Sec. 3, Cl. 1 de la Constitución federal, el pueblo estadounidense delegó al Congreso la facultad de admitir nuevos estados. Esta sección dispone que:

> El Congreso podrá admitir nuevos estados a esta Unión; pero no se formará o establecerá ningún estado nuevo dentro de la jurisdicción de ningún otro estado. Tampoco se formará ningún estado por unión de dos o más estados, o partes de estados, sin el consentimiento tanto de las Asambleas Legislativas de los estados en cuestión como del Congreso. Const. EE.UU., Art IV, LPRA Tomo 1, pág. 177.

El Congreso ha ejercido su facultad de admitir estados a la Unión por los pasados 200 años al admitir treinta y siete estados a la Unión. Queda claro que el poder del Congreso se limita a admitir nuevos estados y no a crearlos. "*The admission power of Congress is not responsible for the birth of the new state. ... Superficial analysis brings some to the conclusion that it is the fact of admission that creates a new state. Yet,*

*Congress has no power to create state[s]"*. R. Hernández Colón, The Commonwealth of Puerto Rico: Territory or State?, 19 Rev. C. Abo. P.R. 207, 235 (1959). El poder de crear y establecer nuevos estados recae en los ciudadanos del territorio. Grupo de Investigadores Puertorriqueños, Breakthrough from Colonialism: An Interdisciplinary Study of Statehood, San Juan, Ed. UPR, 1984, Vol. I, pág. 49.

Ahora bien, el proceso de admisión de nuevos estados no ha sido uniforme. Todo lo contrario, ha sido flexible y adaptable a las particularidades de cada territorio. Comptroller General of the United States, Experiences of past territories can assist Puerto Rico status deliberations, General Accounting Office, 1980, pág. 3.

La decisión de admitir un estado es puramente política. *"The process of admitting a new state to the Union is one of bargaining, of negotiation between the leaders of the territory and Congress"*. Hernández Colón, supra, pág. 233. El Congreso, en el ejercicio de su discreción, considera los intereses políticos y socioeconómicos del momento y decide si da paso a la admisión del prospecto estado. Esto ha sido una constante desde el establecimiento de la nación. Véase, Grupo de Investigadores Puertorriqueños, op. cit., Vol. II, págs. 1255-1259.

### b. Plebiscito y referéndum: Métodos para canalizar la autodeterminación

Uno de los derechos fundamentales que tiene todo ser humano es su autodeterminación. J. Falkowski, Secessionary

Self Determination: a Jeffersonian Perspective, 9 B.U. Intl. L.J. 209, 210-211 (1991). El derecho a la autodeterminación fue pieza clave en la liberación de las trece colonias del yugo británico y de la posterior creación y admisión de cada uno de los 37 territorios que lograron su entrada a la Unión.

Ahora bien, en ninguna parte de la Constitución se requiere un tipo de mecanismo en particular, para medir el sentir del pueblo. Los residentes de cada territorio son libres para decidir qué mecanismos utilizarán para auscultar el parecer de su pueblo. Al hacer un recuento sobre los distintos esquemas que los territorios utilizaron para plasmar el sentir del pueblo sobre la estadidad, se desprende la utilización de cinco métodos: (1) asambleas de pueblo; (2) encuestas; (3) censos y convenciones regionales; (4) elección de diputados territoriales afines a la causa estadista y (5) celebración de referéndums o plebiscitos. Grupo de Investigadores Puertorriqueños, op. cit., Vol. II, pág. 1182. Por la pertinencia a la controversia ante nuestra consideración, solo auscultaremos la utilización del mecanismo del referéndum o plebiscitos.

Diecisiete de los treinta y siete territorios que lograron la admisión a la Unión utilizaron ese método. Íd., pág. 1191. Hubo estados, como Arkansas, que fueron admitidos luego de celebrar un solo referéndum. Grupo de Investigadores Puertorriqueños, íd., Vol. I, pág. 284. Otros, como Hawai'i, celebraron dos referéndums antes de

su admisión como estado, incluyendo el referéndum de ratificación de la Ley de Admisión. Íd., Vol. II, pág. 1010. En cambio, Alaska efectuó tres. Íd., Vol. II, pág. 1187. Por su parte, Maine celebró seis votaciones antes de entrar a la Unión. Íd., Vol. II, pág. 1182.

Como vemos, no se sostiene el argumento de los peticionarios de que la referencia a los procesos de Alaska y Hawai'i en la Exposición de Motivos de la Ley Núm. 51-2020 puede inducir a error, pues implica que este plebiscito es la última vez que Puerto Rico votaría sobre la estadidad. Como vemos, fue luego de que el pueblo en ambos territorios votó a favor de la estadidad, que el Congreso actuó y se consultó sobre los términos de la posible admisión. Es decir, los referéndums iniciales no obligaban al Congreso a actuar y se celebraron sin su "aval" previo. Eran peticiones del pueblo de cada territorio.

Además, la propia ley de Puerto Rico reconoce que en caso de resultar favorecida la alternativa del "Sí", deberá comenzar un proceso de transición y que el voto por esa alternativa no quiere decir que automáticamente se vaya a admitir a Puerto Rico como estado. Véase Art. 4.3 de la Ley Núm. 51-2020.

### c. La ausencia de un aval del Congreso no determina la validez de la consulta.

En resumen, los territorios pueden celebrar referéndums o plebiscitos antes de ser admitidos como estados o de que el Congreso haga una oferta de admisión. No se requiere el aval o autorización del Congreso para solicitar la admisión a la Unión de estados. Requerir que el pueblo del territorio tenga que consultar al gobierno federal para poder encaminar el proceso para resolver su situación política es contrario a los postulados de autodeterminación y de gobierno propio, así como al claro récord histórico.

La validez de este tipo de consulta tampoco depende de que una súper mayoría de los electores apoye que se admita al territorio como un estado de la Unión. Íd., Vol. II, pág. 1190. Como se expresó en el Informe de la Cámara de Representantes para la admisión de Alaska a la Unión, lo importante "es que una mayoría del electorado desee la estadidad". Providing for the Admission of the State of Alaska into the Union, H.R. Rep. No. 624, 85th Cong. 1st Sess. 147, 159 (June 25, 1957) (Traducción nuestra) ("*is that a majority of the electorate wish statehood*"). A veces, incluso, se ha requerido menos. Por ejemplo, el Congreso aprobó la admisión de Nebraska, aunque la mayoría de los electores del territorio rechazaron la estadidad y la constitución propuesta para el estado. Grupo de Investigadores Puertorriqueños, op. cit., Vol. II, págs. 1221-1225. En fin, la decisión depende de la realidad política

imperante y no de ningún requisito legal o constitucional, como el que los peticionarios proponen.

**d. La Asamblea Legislativa tiene la facultad de escoger mecanismos legítimos para adelantar su objetivo y registrar la expresión del pueblo. La sabiduría o conveniencia de esa determinación legislativa es una cuestión política no justiciable.**

La conveniencia o deseabilidad de los mecanismos o estrategias que se utilicen para adelantar un fin público son asuntos políticos. Las cuestiones políticas no son justiciables.

La doctrina de cuestión política plantea esencialmente que existen asuntos que no son susceptibles de una determinación judicial, porque su resolución corresponde a las otras ramas de gobierno y no al Poder Judicial. Noriega v. Hernández Colón, 135 DPR 406 (1994). Se trata de una obligación autoimpuesta por el principio de separación de poderes que rige nuestro sistema republicano de gobierno. Ramos, Méndez v. García García, 2019 TSPR 188, 203 DPR __ (2019). Hay tres instancias básicas en las que aplica la doctrina de cuestión política, a saber: (1) cuando existe un asunto que ha sido asignado textualmente por la Constitución a otra rama del Gobierno; (2) si no existen criterios de decisión susceptibles de descubrirse y administrarse por los tribunales, y (3) cuando lo aconsejable es la abstención judicial, por consideraciones derivadas de la prudencia. Córdova y otros v. Cámara Representantes, 171 DPR 789, 800-801 (2007). Véase, R. Serrano Geyls, Derecho Constitucional de Estados Unidos y

Puerto Rico, San Juan, Ed. C. Abo. P.R, 1986, Vol. I, págs. 679-680.

Al respecto, hemos mencionado que "si la Constitución confiere una facultad expresa a una rama de gobierno y ésta es de naturaleza política, la misma no estará sujeta a revisión judicial salvo que dicha facultad sea ejecutada incorrectamente". Noriega Rodríguez v. Jarabo, 136 DPR 497, 516 (1994). Ahora bien, hemos expresado que "cuando ejercemos la función ineludible e indelegable de interpretar el Derecho en casos de conflictos sobre derechos políticos, así como la constitucionalidad de las fuentes de esos derechos, debemos actuar con mesura, respetando el criterio de otros cuerpos gubernamentales sobre la extensión de sus propios poderes". Íd. Claro está, delinear contornos de las facultades de las otras ramas y la determinación de la validez de sus ejercicios son asuntos reservados a los tribunales. Íd.

En este caso, como ya explicamos, se trata de legislación promulgada válidamente por la Asamblea Legislativa, ante el mandato del pueblo puertorriqueño. No debemos intervenir con la facultad del legislador de hacer valer el mandato del electorado mediante los mecanismos que estime convenientes, siempre y cuando actúe dentro del marco de la Constitución. No es función de los tribunales opinar sobre la sabiduría o conveniencia de una medida legislativa.

En vista de lo anterior, concluimos que el plebiscito ordenado mediante la Ley Núm. 51-2020, supra, cumple un

fin público, ya que permite a todos los puertorriqueños, en igualdad de condiciones, participar y expresarse a favor o en contra de ratificar e implementar la fórmula de estatus que resultó favorecida en los plebiscitos celebrados en 2012 y 2017.

**(iv) La Ley Núm. 51-2020 es neutral y no es discriminatoria.**

Los peticionarios alegan que la Ley Núm. 51-2020 viola el alegado "axioma de igualdad electoral inmerso en la Constitución". Alegato de los peticionarios del MD-2020-2002, págs. 15-16; Alegato del peticionario del MD-2020-0005, págs. 15-17. En Com. PNP v. CEE et al., 197 DPR 914 (2017), tuvimos la oportunidad de corregir los pronunciamientos errados que realizamos en P.P.D. v. Gobernador II, 136 DPR 916 (1994). Allí explicamos que la idea del "axioma" de igualdad económica entre los partidos no es de estirpe constitucional. Com. PNP v. CEE et al., supra, en la pág. 928. Citamos al profesor Luis M. Villaronga, quien expresó muy acertadamente lo siguiente:

> Como es sabido "axioma" significa una "[a]firmación tan evidente que es admitida por todos sin necesidad de demostración". 1 María Moliner, Diccionario de uso del español 318 (1986). Ni la Constitución de Puerto Rico ni la de los Estados Unidos contienen tal [principio de igualdad económica] respecto a personas en general y mucho menos respecto a los partidos políticos. (Énfasis suplido). L.M. Villaronga, Derecho constitucional, 66 Rev. Jur. UPR 391, 402 esc. 48 (1997).

Ahora bien, indistintamente del alcance del concepto "igualdad electoral" y de sus diferentes concepciones, aun bajo las visiones mayoritarias y minoritarias de este

Tribunal, la realidad es que en esta controversia no hay cabida para que prospere un planteamiento de esa naturaleza. Incluso, aun bajo el anterior y el vigente precedente no hay posibilidad de validar un planteamiento de desigualdad en esta controversia, toda vez que la legislación impugnada no concede a la opción "Sí" o a la opción "No" alguna ventaja cualitativa o cuantitativa.

Lo que sí es correcto es analizar el señalamiento de los peticionarios tomando en cuenta que el texto de la Constitución de Puerto Rico es neutral en cuanto al destino político de la Isla. Por lo tanto, no favorece ni cierra puertas a alternativa alguna de estatus. P.S.P. v. E.L.A., 107 DPR 590, 606 (1978). A esos efectos, en Báez Galib II, supra, pág. 400, expresamos que cualquier medida legislativa o gubernamental que tenga el efecto de inclinar la balanza a favor de alguna alternativa de estatus **sin que tenga la aprobación de los ciudadanos de Puerto Rico**, infringe el esquema de neutralidad que al respecto se deriva de nuestra Constitución. Sostuvimos lo siguiente:

> La Legislatura, si bien puede formular política pública sobre distintas áreas del quehacer gubernamental legítimo, no puede aprobar legislación que altere sustancialmente la relación política de Puerto Rico con Estados Unidos **sin que previamente haya obtenido la aprobación de los puertorriqueños a ese curso de acción.** Báez Galib II, supra, pág. 400, citando a P.S.P. v. E.L.A., supra, pág. 606.

Como vemos, nuestro precedente sostiene que no se puede aprobar legislación que altere sustancialmente la

relación política de Puerto Rico con Estados Unidos sin que previamente haya obtenido la aprobación de los puertorriqueños. Hoy reafirmamos esa norma. No cabe duda de que "[e]l pueblo de Puerto Rico conserva la facultad de procurar cambios de [e]status". Ramírez de Ferrer v. Mari Brás, 144 DPR 141, 205 (1997).

Cuando decidimos Báez Galib II no había un mandato del pueblo; hoy sí lo hay. El pueblo otorgó ese mandato en los plebiscitos de 2012 y 2017. Ahora se propone consultarle en específico si desea ratificar la preferencia que manifestó entonces, para adelantar así el proceso iniciado en 2012. La Ley Núm. 51-2020 provee igual oportunidad a todos los electores hábiles en Puerto Rico para expresar su acuerdo o desacuerdo con la alternativa de estadidad.

Como vemos, la consulta de estatus político a efectuarse el 3 de noviembre de 2020 es un mecanismo válido y no discriminatorio, con un fin eminentemente público. No existe problema alguno de representatividad o desigualdad. Las personas que prefieren alternativas que no sean la estadidad tienen la opción de votar "No", al igual que aquellas que favorecen la estadidad tienen la opción de votar "Sí", independientemente de si pertenecen a algún partido político o no. Lo que pretenden los peticionarios es que se haga otra consulta consignando las mismas opciones que fueron rechazadas reiteradamente en los plebiscitos celebrados en los años 2012 y 2017. No se puede invocar el principio de neutralidad ni tampoco

invocar una alegada desigualdad para fosilizar la voluntad del pueblo.

IV

**A. Ley Núm. 58-2020**

El 20 de enero de 2018, el entonces Gobernador de Puerto Rico, Hon. Ricardo Rosselló Nevares, firmó la Ley Núm. 12-2018, conocida como la "Ley para garantizar el voto presidencial a todos los ciudadanos americanos residentes en Puerto Rico", 16 LPRA sec. 976 et seq. Sin embargo, con la aprobación de la Ley Núm. 58-2020, se derogó la Ley Núm. 12-2018, supra, pero se adoptaron íntegramente todas sus disposiciones para hacerlas formar parte del Código Electoral de Puerto Rico de 2020. Véase, Art. 1.1 de la Ley Núm. 58-2020.

La Exposición de Motivos de la Ley 58-2020 sostiene que a los habitantes de Puerto Rico "se les priva de su derecho a votar en elecciones federales en igualdad de condiciones con sus conciudadanos en el resto de la Nación". Luego añade:

> **Esa privación, se impone unilateralmente por el Gobierno federal bajo las premisas de un sistema territorial y colonial que fue rechazado por el pueblo de Puerto Rico en los Plebiscitos recientes de 2012 y 2017. En ambas consultas electorales, incluso, el pueblo de Puerto Rico también reclamó la igualdad de derechos y obligaciones con la estadidad.** La privación del derecho al voto federal lesiona los principios fundamentales de la democracia americana, de la autodeterminación de los ciudadanos y del ordenamiento de un sistema republicano en el que la autoridad del gobierno debe ser ejercida con el consentimiento del voto de los gobernados. (énfasis nuestro).

Según el legislador, el ejercicio del Voto Presidencial que promueve esta ley

> constituye un **acto constitucionalmente protegido para exigir la reparación del agravio de la privación del derecho al voto de los ciudadanos americanos de Puerto Rico y para que se les reconozca el derecho a votar por el Presidente que rige sus vidas.**
> …
> El ejercicio del derecho al voto presidencial constituye un instrumento decisivo en la misión de defender los derechos civiles y humanos de los ciudadanos americanos de Puerto Rico frente a la desigualdad y las desventajas de la centenaria condición territorial y colonial. Exposición de Motivos, Ley 58-2020, págs. 11, 13.

En cuanto al fin público, el legislador expresó lo siguiente:

> La autorización del uso de propiedad y fondos públicos que aquí se hace para estos propósitos **se fundamenta en el mandato electoral vigente - nunca revocado- que expresó el pueblo soberano y elector en los plebiscitos de 6 de noviembre de 2012 y 11 de junio de 2017** y en los que, por abrumadora mayoría, rechazó el estatus colonial y manifestó su preferencia por la admisión de Puerto Rico como un estado de la Unión. Exposición de Motivos, Ley 58-2020, pág. 13.

A esos efectos, la Ley Núm. 58-2020 ordena que el día de cada elección general, comenzando con la del año 2024, todo ciudadano americano domiciliado en Puerto Rico pueda ejercer su voto para expresar su preferencia entre los candidatos y exigir que su voto sea contado en cada elección presidencial. Íd. Así, el Art. 8.1.b de la ley establece que "en el mismo día de cada Elección General, comenzando con la que se realice en el año 2024, todo ciudadano americano que sea Elector hábil en Puerto Rico ejerza y reclame su derecho al voto para expresar su

preferencia entre los candidatos a Presidente y Vicepresidente de Estados Unidos de América".

Cónsono con lo anterior, el Art. 8.3.b de la ley dispone que "[c]ada cuatro (4) años, en el mismo día de las Elecciones Generales, comenzando con la Elección General del año 2024, la Comisión deberá organizar y viabilizar que los electores en Puerto Rico emitan su voto para expresar su preferencia entre los Candidatos para los cargos de Presidente y Vicepresidente de Estados Unidos de América".[5]

## B. Justiciabilidad de la controversia

Hemos expresado que los tribunales solo podemos evaluar aquellos casos que son justiciables. Al respecto, en Smyth, Puig v. Oriental Bank, 170 DPR 73, 76 (2007) expresamos que "los propios tribunales deben preguntarse y evaluar si es o no apropiado entender en un determinado caso, mediante un análisis que les permite ejercer su discreción en cuanto al límite de su poder constitucional". Así, en aras de proteger este principio, se han desarrollado ciertos criterios de justiciabilidad que demarcan la facultad de los tribunales para entender

---

[5] Sin embargo, el Art. 8.22.b, que se refiere a la "Votación por los Compromisarios", expresa que "[l]os procesos de votación de los Compromisarios y su escrutinio, siempre se realizarán en el Capitolio de Puerto Rico. Para la primera Elección Presidencial de 3 de noviembre de 2020 estos trabajos serán dirigidos por el Presidente de la Cámara en el hemiciclo de ese cuerpo legislativo…"

Tras un análisis íntegro del Subcapítulo VIII-B de la Ley Núm. 58-2020, es evidente, que la referencia a la fecha del 3 de noviembre de 2020 es un error en la redacción del estatuto. Todas las demás disposiciones del estatuto establecen que la primera elección presidencial será en 2024. Véanse, Arts. 8.1.b y 8.3.b.

en un asunto traído ante sí, entre estos la madurez de la controversia planteada. Romero Barceló v. E.L.A., 169 DPR 460, 470 (2006).

La prudencia y la no deseabilidad de opiniones consultivas fundamentan el requisito de madurez. R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico, op. cit., Vol. I, pág. 195. En estos casos, "resulta determinante, pues, que la controversia se encuentre concretamente definida, de forma que el tribunal pueda justipreciarla en sus méritos". Clases A, B y C v. PRTC, 183 DPR 666, 692 (2011). Así, "todo lo que se necesita para asegurar que un caso está maduro es que el evento contemplado... con toda probabilidad va a ocurrir". J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos, Bogotá, Ed. Temis, 2009, pág. 203, esc. 8.

Hay quienes plantean que este Tribunal carece de jurisdicción para atender el reclamo relacionado con la votación para Presidente y Vicepresidente de los Estados Unidos, pues alegan que es prematuro. Según esa postura, la celebración de la elección presidencial en 2024 es especulativa, ya que se puede enmendar la Ley Núm. 58-2020 para eliminar el Subcapítulo VIII-B.

Eso sí es especulativo. No hay un requisito legal de esperar a 2024 para poder impugnar la ley. Al presente hay un evento con fecha cierta, programado por ley, que se aprobó válidamente. Por lo tanto, la celebración del evento no depende de eventos inciertos. Lo que sí depende

de hechos inciertos, hipotéticos y especulativos es que no se celebre el evento como está programado por ley. No podemos abstenernos de asumir jurisdicción cada vez que una parte plantee que una ley puede ser enmendada. Si fuera así, nos quedaríamos sin controversias que adjudicar.

Establecida la justiciabilidad de esta controversia, evaluemos los méritos de la impugnación presentada.

### C. Fin Público del Subcapítulo VIII-B de la Ley Núm. 58-2020

Los peticionarios se amparan en lo resuelto en Báez Galib II, al alegar que el Subcapítulo VIII-B de la Ley Núm. 58-2020, supra, que autoriza la celebración de las elecciones presidenciales en Puerto Rico, es inconstitucional porque no tiene un fin público. En ese caso resolvimos que la Ley Núm. 403-2000, titulada "Ley de Elecciones Presidenciales de Puerto Rico", violaba el Art. VI, Sec. 9 de la Constitución de Puerto Rico, por no tener un fin público, ya que los ciudadanos americanos en Puerto Rico no tienen derecho a votar por el Presidente y Vicepresidente en las elecciones presidenciales. Íd., págs. 397-399. Por otro lado, descartamos el argumento de que permitir al pueblo expresar su deseo de votar por el Presidente y Vicepresidente de los Estados Unidos le confería un fin público a la medida en controversia. Razonamos que la Ley Núm. 403-2000 no se concibió como una consulta sobre la deseabilidad del voto presidencial, sino

que se presumió la validez del voto en las elecciones presidenciales. Íd. pág. 400.

Por el contrario, en la Exposición de Motivos de la Ley Núm. 58-2020, el legislador expresó que "el ejercicio del derecho al voto presidencial constituye un instrumento decisivo en la misión de defender los derechos civiles y humanos de los ciudadanos americanos de Puerto Rico frente a la desigualdad y las desventajas de la centenaria condición territorial y colonial". Exposición de Motivos, Ley Núm. 58-2020, pág. 11. En esa dirección, el legislador expresó que "[l]a historia nos enseña que, en la cultura política americana, los derechos no se suplican, se exigen y se demandan. A Puerto Rico le ha llegado la hora de exigir los derechos de igualdad política y socioeconómica que le corresponden dentro de la ciudadanía americana". Íd. Es por esto que el legislador estableció que todos los puertorriqueños pueden ejercer su voto "para expresar su preferencia entre los candidatos a Presidente y Vicepresidente de Estados Unidos de América; y también exigir que su voto sea contado en cada elección presidencial". Íd.

La propuesta de celebrar elecciones presidenciales en Puerto Rico no es reciente y mucho menos ajena a nuestra historia. El exgobernador Luis Muñoz Marín defendió esta propuesta ante el Congreso. En una ocasión en que el Congreso estaba considerando brindarles el voto presidencial a los conciudadanos de Washington DC, el entonces gobernador Muñoz Marín participó de la vista

pública y abogó para que se concediera a los puertorriqueños el derecho a votar por el presidente de la Nación. District of Columbia Representation and Vote: Hearings Before Subcommittee Number 5 of the House Committee on the Judiciary on House Joint Resolution 529, 86th Cong., 2d Sess. 21 (1960).

Cónsono con esa visión, en 1962, la Asamblea Legislativa puertorriqueña -controlada por miembros del Partido Popular Democrático- aprobó unánimemente una resolución para que se permitiera a los residentes en Puerto Rico votar por el presidente de los Estados Unidos de América. A. Quiñones Calderón, La obra de Luis A. Ferre en la Fortaleza, San Juan, Ed. Servicios Editoriales, 1975, pág. 150. En esa línea, la Asamblea de Programa y Reglamento del Partido Popular se reunió el 1 de agosto de 1962 y aprobó por mayoría que la "culminación del Estado Libre Asociado no estará completa si no se logra el derecho puertorriqueño a votar para elegir el Presidente y el Vicepresidente de Estados Unidos". Quiñones Calderón, op. cit., pág. 150 (Citando al periódico El Mundo de 2 de agosto de 1962). Postura similar tuvo el exgobernador Luis A. Ferré, al expresar que se tenía que "echar mano a la institución más poderosa, el voto presidencial, para poder lograr que futuros presidentes conozcan a fondo los problemas puertorriqueños aún por resolver y que se interesen en ellos". Quiñones Calderón, op. cit., pág. 151.

A esos fines, en julio de 1969, el gobernador Luis A. Ferré propuso al presidente Richard M. Nixon un comité *ad hoc*, compuesto por puertorriqueños y americanos del continente, para estudiar la viabilidad del voto presidencial y hacer las recomendaciones para adelantar ese fin. Íd., pág. 159. El presidente accedió y nombró el comité *ad hoc*. En agosto de 1971, el comité sometió su informe. Recomendó que se le concediera a todos los puertorriqueños el derecho a votar por el Presidente y Vicepresidente de Estados Unidos. Íd., pág. 167. A esos efectos, propuso que se sometiera al electorado, a la brevedad posible, la pregunta de si este favorecía o no el voto presidencial. Íd.

En respuesta a las recomendaciones del comité, el gobernador Ferré propuso que se celebrara un referéndum de voto presidencial a finales de 1971. En cambio, el Senado -controlado por el Partido Popular Democrático- aprobó el sustitutivo al P. de la C. 1458, el cual disponía la "Celebración de un referéndum el primer domingo de noviembre de 1973, en el cual el pueblo de Puerto Rico exprese su voluntad en cuanto a si desea que se conceda el derecho a votar por los candidatos a la Presidencia y Vicepresidencia de los Estados Unidos de América". R. Hernández Colón, Desde el Senado: El Presidente informa, http://dspace.cai.sg.inter.edu/xmlui/bitstream/handle/123456789/11741/B17c003d005.pdf?sequence=1 (última visita, 25 de septiembre de 2020). El presidente del Senado insistió en que cualquier medida relacionada con el voto

presidencial en Puerto Rico debía considerarse como parte del desarrollo del Estado Libre Asociado y no como un paso para adelantar la admisión de Puerto Rico como un estado de la Unión. Véase, R. Hernández Colón, *Estado Libre Asociado, naturaleza y desarrollo*, San Juan, Ed. Calle Sol, 2014, pág. 373. La discrepancia de fechas y la suspicacia sobre los motivos del gobernador para adelantar el voto presidencial evitaron que la propuesta de referéndum se convirtiera en ley.

Las leyes para viabilizar una votación presidencial no son extrañas en un territorio, a pesar de la inhabilidad de sus habitantes para votar por el Presidente y Vicepresidente. Puerto Rico, por decirlo así, no inventó esa rueda. Todo lo contrario, el territorio de Guam lleva desde 1980 celebrando elecciones presidenciales, en conjunto con sus comicios generales. 3 GCA sec. 7107 ("*The ballot for the general election in each year evenly divisible by four (4) shall contain the names of the nominees for President and Vice-President of the United States of each national political party which has made such nominations*".). Además de ordenar la celebración de la elección presidencial, la Sec. 11130 faculta al presidente del organismo electoral de Guam a representar al territorio como su elector en el colegio electoral y a emitir su voto por los candidatos a Presidente y Vicepresidente que obtuvieron la mayor cantidad de votos en Guam. 3 GCA sec. 11130.

La celebración de las elecciones presidenciales en
Puerto Rico- al igual que ocurre en Guam- es una forma en
la cual el pueblo puede canalizar su aspiración de
participar en la elección de los funcionarios cuyas
decisiones impactan la vida diaria. Queda claro que el
legislador concibió la celebración de las elecciones
presidenciales en Puerto Rico como un proceso de expresión
política y no como uno que automáticamente le concede el
derecho al voto en las elecciones presidenciales a los
ciudadanos americanos en Puerto Rico. Sostenemos que no
nos compete, como miembros del Tribunal Supremo, juzgar la
sabiduría de la celebración de las elecciones
presidenciales en Puerto Rico. **Esa labor es del pueblo;
única, exclusiva y terminantemente del pueblo.** Véase,
P.I.P. v. E.L.A., supra, pág. 47.

**D. El Subcapítulo VIII-B de la Ley Núm. 58-2020 no es discriminatorio**

Los peticionarios argumentan que el Subcapítulo VIII-
B de la Ley Núm. 58-2020, que autoriza las elecciones
presidenciales, es discriminatorio. Sostienen que, según
Báez Galib II, supra, pág. 400, el voto presidencial
favorece una fórmula específica de estatus para Puerto
Rico sobre las demás alternativas, por lo que infringe el
"axioma constitucional de igualdad electoral de los
partidos políticos inscritos". Como discutimos
anteriormente, ese "axioma de igualdad" no existe en la
Constitución. Com. PNP v. CEE et al., supra. Lo correcto
es referirnos al principio de neutralidad, ya que, según

explicamos, la Constitución no favorece ninguna fórmula específica de estatus.

Como se desprende, al concebir y aprobar la Ley Núm. 58-2020, el legislador era consciente de que los ciudadanos americanos residentes en Puerto Rico no tienen derecho a votar por el Presidente y Vicepresidente de la Nación. Es ante esa realidad que el legislador viabilizó la celebración de una consulta en la cual los ciudadanos americanos residentes en Puerto Rico pudieran "**expresar su preferencia** entre los candidatos a Presidente y Vicepresidente de Estados Unidos de América y **exigir que su voto sea contado** en cada elección presidencial". Íd. Por lo tanto, a diferencia de la Ley Núm. 403-2000, la Ley Núm. 58-2020 tiene un fin público discernible y definido. Es una expresión de una preferencia, cónsona con el mandato electoral de estadidad de 2012 y 2017.

No cabe duda de que el pueblo puertorriqueño siempre ha abrazado los procesos democráticos como herramienta para el crecimiento de nuestra sociedad. Como evidencia de ello, en el Preámbulo de la Constitución quedaron plasmados los valores y postulados que, como pueblo, decidimos adoptar y proteger, a saber:

> **Nosotros, el pueblo de Puerto Rico, a fin de** organizarnos políticamente sobre una base plenamente democrática, **promover el bienestar general y asegurar para nosotros y nuestra posteridad el goce cabal de los derechos humanos,** puesta nuestra confianza en Dios Todopoderoso, ordenamos y establecemos esta Constitución para el estado libre asociado que en el ejercicio de nuestro derecho natural

ahora creamos dentro de nuestra unión con los Estados Unidos de América.

Al así hacerlo declaramos:

Que el sistema democrático es fundamental para la vida de la comunidad puertorriqueña;

Que entendemos por sistema democrático aquel donde la voluntad del pueblo es la fuente del poder público, donde el orden político está subordinado a los derechos del hombre y **donde se asegura la libre participación del ciudadano en las decisiones colectivas;**

**Que consideramos factores determinantes en nuestra vida la ciudadanía de los Estados Unidos de América y la aspiración a continuamente enriquecer nuestro acervo democrático en el disfrute individual y colectivo de sus derechos y prerrogativas…** Const. PR, Preámbulo, LPRA, Tomo 1 (Énfasis suplido).

Es evidente que, al ratificar su Carta Magna, el pueblo de Puerto Rico estableció la importancia de la participación plena en los procesos que impacten su futuro como sociedad, para preservar y desarrollar su sistema democrático. De igual forma, dejó claro el factor determinante que tiene la ciudadanía americana en nuestras vidas y la aspiración constante a enriquecer nuestro quehacer como sociedad, con los derechos y prerrogativas que esa ciudadanía confiere. Íd.

Uno de los grandes derechos que tienen los ciudadanos americanos en los estados de la Unión es el derecho a votar por el Presidente y Vicepresidente de Estados Unidos. En cambio, los ciudadanos americanos domiciliados en Puerto Rico no disfrutan de ese derecho, debido a que

Puerto Rico es un territorio de Estados Unidos. Véase, Igartúa de la Rosa v. USA, 417 F.3d 145 (1er Cir. 2005). No obstante, desde la adopción de su Constitución, el pueblo puertorriqueño estableció una aspiración de continuar enriqueciendo los derechos y prerrogativas de su ciudadanía americana.

El acto de expresar aspiraciones colectivas en el Preámbulo de la Constitución no fue una acción aislada. De igual forma se hizo en la Carta de Derechos. Así lo expresó el delegado en la Convención y luego Juez Presidente del Tribunal Supremo, José Trías Monge: "Retoricismo y reformismo hicieron de buen parte de nuestra carta de derechos más una declaración de aspiraciones y propósitos que una consignación de libertades en efecto gozadas o exigibles de inmediato". J. Trías Monge, Historia Constitucional de Puerto Rico, Ed. UPR, 1982, Vol. III, pág. 169. (Énfasis suplido).

La Constitución de Puerto Rico no comprometió el futuro político del territorio. Por el contrario, reconoció que las aspiraciones que se plantearon en la Constitución pertenecen al pueblo y, por esa razón, no pueden estar sujetas a ninguna fórmula de estatus político. Por eso, hemos resuelto lo siguiente:

> Es al pueblo de Puerto Rico, por tanto, a quien corresponde entender directamente en la decisión de su destino político final o en la aprobación de medidas que afecten de modo importante sus relaciones con Estados Unidos. La Asamblea Legislativa del país tiene facultad para disponer plebiscitos no discriminatorios sobre tales medidas o sobre la cuestión general del [e]status. La asignación de fondos para

tales fines constituye indudablemente una asignación de fondos para fines públicos. La Asamblea Legislativa está desprovista de poder, sin embargo, para legislar en zonas reservadas al pueblo de Puerto Rico, tales como la relativa al voto presidencial, **a menos que el pueblo la autorice expresamente**. P.S.P. v. E.L.A., supra, pág. 609 (Énfasis suplido).

Es correcto que la consecución de la aspiración plasmada en el preámbulo de la Constitución de Puerto Rico no está atada a ninguna fórmula de estatus. P.S.P. v. E.L.A., íd., pág. 605. Ahora bien, tampoco cierra las puertas a cualquier iniciativa legislativa dirigida a implementar y obedecer un mandato electoral directo del pueblo, expresado en las urnas.

En esa línea, en Báez Galib II, supra, pág. 400, resolvimos que "[c]ualquier medida legislativa o gubernamental que tenga el efecto de inclinar la balanza a favor de alguna alternativa de estatus **sin que tenga la aprobación de los puertorriqueños**, infringe el esquema de neutralidad que al respecto se deriva de nuestra Constitución" (Énfasis suplido). Por esa razón, invalidamos entonces una ley para implementar el voto presidencial en Puerto Rico.

A diferencia de la situación imperante en 2000, cuando resolvimos Báez Galib II, en 2017 el pueblo autorizó expresamente a la Asamblea Legislativa a aprobar una ley de voto presidencial. En la definición de la fórmula de estadidad se encontraba un reclamo expreso para adelantar la obtención del voto presidencial en Puerto Rico,

mediante legislación federal o estatal. En específico, la definición establecía lo siguiente:

> Con mi voto reitero mi petición al Gobierno federal para comenzar de inmediato el proceso para la descolonización de Puerto Rico con la admisión de Puerto Rico como estado de la unión de Estados Unidos de América. Soy consciente de que el resultado de esta petición de Estadidad conllevaría iguales derechos y deberes con los demás estados; y la unión permanente de Puerto Rico con los Estados Unidos de América. **Soy consciente, además, que mi voto** en reclamo de la Estadidad **significa mi apoyo a toda gestión dirigida a la admisión de Puerto Rico como un estado de la Unión y a toda legislación estatal** o federal **dirigida a establecer** la igualdad de condiciones, la Representación Congresional y **el Voto Presidencial para los ciudadanos americanos de Puerto Rico.** Véase además, Exposición de Motivos Ley 51-2020, supra, en la pág. 6 (énfasis suplido).

No cabe duda de que al legislador le constaba el mandato conferido por el pueblo, al aprobar el Subcapítulo VIII-B de la Ley Núm. 58-2020 y articular la celebración del voto presidencial en Puerto Rico. Debemos dar deferencia al deseo del pueblo. Más aún, hemos expresado que en la Asamblea Legislativa es "donde maduran y toman forma las fuerzas sociales... y donde sólo es posible definir... los elementos que componen y constituyen el llamado fin o interés público, [por lo que] las opciones del legislador en este campo son amplias, siempre y cuando éste se mueva dentro del marco de la Constitución". P.I.P. v. C.E.E., supra, págs. 607-608.

Por todo lo anterior, en esta ocasión resulta innecesario revaluar el requisito instaurado en Báez Galib II de que este tipo de legislación requiere autorización expresa del pueblo.

Otro de los argumentos de los peticionarios es que la Ley Núm. 58-2020, supra, no persigue un fin público, porque carece de consecuencia práctica y jurídica. Alegato de los peticionarios del MD-2020-0002, págs. 11-15; Alegato del peticionario del MD-2020-0005, pág. 18. Argumentan que como los compromisarios elegidos por el pueblo no tendrán derecho a votar en el Colegio Electoral que elige al Presidente y al Vicepresidente, la Asamblea Legislativa aprobó una ley inútil.

"Hemos destacado en el pasado que, como condición para expedir un auto de mandamus, debemos considerar los factores siguientes: 'el posible impacto que este pueda tener sobre lo[s] intereses públicos que puedan estar [involucrados]; ... evitar una intromisión indebida en los procedimientos del poder ejecutivo, y que el auto no se preste a confusión o perjuicios de los derechos de terceros'". Báez Galib II, supra, pág. 392, citando a Noriega v. Hernández Colón, supra, pág. 448. Véase, además, AMPR v. Srio. Educación, E.L.A., 178 DPR 253, 268 (2010).

El mandamus solicitado no cumple con esos criterios. Contrario a lo que los peticionarios alegan, las consecuencias prácticas de un estatuto o los efectos que pueda tener o no tener, no son un factor que determina su

constitucionalidad. "Nunca hemos resuelto que fin público significa un fin que 'produzca derecho' o que tenga efectos exclusivamente 'jurídicos' ". Báez Galib II, pág. 450 (Corrada Del Río, J., Opinión disidente). De hecho, en 2007 convalidamos la constitucionalidad de un referéndum para que el pueblo expresara si quería que se estableciera un sistema legislativo unicameral en Puerto Rico, aunque la consulta no tenía efecto legal porque no se atenía al proceso de enmiendas a la Constitución (Const. PR, Art. VII, Sec. 1, Tomo 1 LPRA), necesario para que la unicameralidad entrara en vigor, y aunque solo participó el 22.6% de los electores inscritos. Córdova y otros v. Cámara Representantes, supra. Sostuvimos que aunque era inconstitucional que la legislación pretendiera obligar a los legisladores a iniciar un proceso de enmiendas a la Constitución, esta "no prohíbe celebrar un referéndum antes de iniciarse el proceso contemplado en el Art. VII, Sec. 1, *supra*, para palpar el sentir de la ciudadanía". Íd., pág. 806. En este sentido, modificamos lo resuelto en Báez Galib II.

En una democracia es legítima cualquier expresión electoral válidamente emitida en las urnas. Córdova y otros v. Cámara Representantes, íd. Su

> carácter consultivo no implica que el resultado del referéndum... esté huérfano de efecto alguno en nuestras ramas representativas de gobierno. Este efecto se reserva al ámbito político, por lo que a fin de cuentas y como siempre ocurre en una democracia, es a través del ejercicio del voto que los electores expresan su sentir sobre los distintos asuntos que se discuten a diario en la vida política puertorriqueña. Íd., pág.

826 (Rodríguez Rodríguez, J., Opinión de conformidad).

Se trata de una dinámica natural en los procesos políticos que merece extrema deferencia. "La obligación del Estado de proteger ese derecho ha sido igualmente reconocida". P.I.P. v. C.E.E., supra, pág. 615. Por lo tanto, resulta razonable que la Asamblea Legislativa -dentro de sus prerrogativas- haya decidido articular un evento en el cual el pueblo pueda expresarse, al votar por el Presidente y Vicepresidente de la Nación. La discusión sobre la efectividad, necesidad o conveniencia de esta legislación no es un asunto que se deba discutir en un foro judicial, sino en la arena pública.

"[P]ara justificar la intervención de un tribunal se requiere 'un caso claro de desviación de cualquier propósito público que razonablemente pudiera concebirse', o... 'un despliegue de poder arbitrario, no una demostración de juicio'. Y esa autoridad judicial... debe ejercitarse con la 'más extrema cautela'". P.R. Telephone Co. v. Tribl. Contribuciones, 81 DPR 982, 996-997 (1960) (citas omitidas). Más aún, al evaluar si una ley tiene un fin público, los tribunales venimos obligados a reconocer que ese concepto no es estático. "[T]iene que 'ceñirse a las cambiantes condiciones sociales de una comunidad específica y los problemas peculiares que éstas crean y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad democrática altamente compleja'". P.I.P. v. C.E.E., supra, pág. 612, citando a

P.R. Telephone Co. v. Tribl. Contribuciones, supra, pág. 997.

El fin público de la Ley Núm. 58-2020 surge no solo de las aspiraciones que el pueblo expresó en el Preámbulo de la Constitución del Estado Libre Asociado, sino más recientemente, del mandato electoral dado en el plebiscito de 2017. Reafirmamos lo resuelto en Báez Galib II, de que este tipo de legislación necesita ser autorizada por el pueblo. Como esa autorización expresa para la Ley Núm. 58-2020 se obtuvo en el plebiscito de 2017 y es cónsona con las aspiraciones que el pueblo de Puerto Rico manifestó al aprobar su Constitución, no nos corresponde invalidar la legislación impugnada.

V

En conclusión, ante el mandato del electorado favoreciendo la fórmula de estadidad en dos ocasiones distintas y reclamando la aprobación de legislación para implementar el voto presidencial, así como ante las aspiraciones que el pueblo expresó en el Preámbulo de la Constitución, las leyes impugnadas en estos casos consolidados cumplen con un fin público.

Acogemos las comparecencias, como amigos de la corte, del Lcdo. Eudaldo Báez Galib, el Lcdo. Gregorio Igartúa De la Rosa, el Senado de Puerto Rico, el Partido Nuevo Progresista y la Hon. Jennifer A. González Colón.

Por los fundamentos expuestos en esta Opinión, y acogidos los recursos, se dictará Sentencia en jurisdicción original, de conformidad con el Art. 8.3(a)

de la Ley Núm. 51-2020, para adjudicar la impugnación de ese estatuto. Sostenemos la constitucionalidad de esa ley. Además, resolvemos que el Subcapítulo VIII-B de la Ley Núm. 58-2020 es constitucional y, por ello, se deniega el auto de mandamus solicitado para suspender su implementación.


                              RAFAEL L. MARTÍNEZ TORRES
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Orlando José Aponte Rosario; Hon. Rafael Hernández Montañez; Hon. José Varela Fernández; Hon. Ángel R. Matos García; Hon. Carlos A. Bianchi Angleró; Hon. Jesús Manuel Ortiz; Hon. Ramón Luis Cruz Burgos; Carlos Rodolfo Colón Rosario; Leslie Ramos Rodríguez<br><br>Peticionarios<br><br>v.<br><br>Presidente Comisión Estatal de Elecciones; Estado Libre Asociado de Puerto Rico<br><br>Recurridos<br><br>_____<br><br>Hon. Luis Ricardo Vega Ramos en su carácter personal y como representante a la Cámara de Representantes del Estado Libre Asociado de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Presidente Comisión Estatal de Elecciones; Estado Libre Asociado de Puerto Rico<br><br>Recurridos | MD-2020-002<br><br>cons. con<br><br>MD-2020-005 |

SENTENCIA

En San Juan, Puerto Rico, a 5 de octubre de 2020.

Acogemos las comparecencias, como amigos de la corte, del Lcdo. Eudaldo Báez Galib, el Lcdo. Gregorio Igartúa De

la Rosa, el Senado de Puerto Rico, el Partido Nuevo Progresista y la Hon. Jennifer A. González Colón.

Por los fundamentos expuestos en esta Opinión que antecede, la cual se hace formar parte de esta Sentencia, y acogidos los recursos, se dicta Sentencia en jurisdicción original, de conformidad con el Art. 8.3(a) de la Ley Núm. 51-2020, para adjudicar la impugnación de ese estatuto. Sostenemos la constitucionalidad de esa ley. Además, resolvemos que el Subcapítulo VIII-B de la Ley Núm. 58-2020 es constitucional y, por ello, se deniega el auto de <u>mandamus</u> solicitado para suspender su implementación.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió una opinión disidente. El Juez Asociado señor Colón Perez emitió una Opinión disidente a la cual se unieron la Jueza Presidenta Oronoz Rodríguez y la Juez Asociada señora Rodríguez Rodríguez.


                              José Ignacio Campos Pérez
                           Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Orlando José Aponte Rosario; Hon. Rafael Hernández Montañez; Hon. José Varela Fernández; Hon. Ángel R. Matos García; Hon. Carlos A. Bianchi Angleró; Hon. Jesús Manuel Ortiz; Hon. Ramón Luis Cruz Burgos; Carlos Rodolfo Colón Rosario; Leslie Ramos Rodríguez

Peticionarios

v.

Presidente Comisión Estatal de Elecciones; Estado Libre Asociado de Puerto Rico

Recurridos

**Núm.**MD-2020-0002

cons. con

MD-2020-0005

Hon. Luis Ricardo Vega Ramos en su carácter personal y como representante a la Cámara de Representantes del Estado Libre Asociado de Puerto Rico

Peticionario

v.

Presidente Comisión Estatal de Elecciones; Estado Libre Asociado de Puerto Rico

Recurridos

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

En San Juan, Puerto Rico, a 5 de octubre de 2020.

"La Lógica es un cajón de gran tamaño donde guardamos algunas herramientas útiles, y muchas otras superfluas. La persona sabia busca en el cajón con dos propósitos: para aprovecharse de aquellos instrumentos que le son útiles y para admirar la inventiva con la cual aquellos que no lo son, se acomodan y se organizan."

Charles Caleb Colton, Poeta inglés (1780-1832)

Durante el día de hoy, una mayoría de los integrantes de este Tribunal permite el desembolso millonario de fondos públicos para la celebración de dos eventos electorales que carecen de un fin público y cuyos resultados serán completamente inconsecuentes. La única consecuencia directa de la celebración de esos eventos electorales será justamente la sustracción de casi tres millones de dólares del presupuesto gubernamental a expensas de un pueblo abatido por los efectos de la corrupción, el mal gobierno, la pobreza, el desempleo y -más recientemente- una pandemia mundial que ha expuesto en definitiva las precariedades e inequidades socioeconómicas yacentes. Por entender que el proceder de la mayoría es inconstitucional, disiento impetuosamente.

Las implicaciones sociales y económicas del curso de acción de una mayoría son igual de peligrosas y problemáticas que el precedente judicial que hoy se pauta. En esencia, el razonamiento de una mayoría consiste en distinguir -aún en ausencia de una diferencia tangible- un precedente judicial que presuntamente se reafirma mediante un resultado patentemente contrario a éste. Dicho de otra forma, la mayoría establece una distinción sin diferencias, para presuntamente no revocar lo revocado.

Ante tan ininteligible silogismo, queda claro que el designio político de la mayoría es el mismo que se persigue mediante los eventos electorales aquí impugnados. Así, la mayoría recurre a artilugios semánticos y glosas ilusas que, empleadas con una maña magistral, ajustan el efecto de

un precedente de gran arraigo en nuestro ordenamiento electoral al fin deseado. Más que un paralogismo retórico, la opinión de la mayoría es un sofisma sagaz que honra a Gorgias; un réquiem discreto al valor del precedente en nuestra jurisdicción y a la seriedad, agudeza y sensatez judicial.[6]

Por todo lo anterior, disiento del curso mayoritario.


                                        Anabelle Rodríguez Rodríguez
                                              Juez Asociada


---

[6] Llamemos las cosas por su nombre y no seamos ilusos. La ley que la mayoría avala a través de sus galimatías constitucionales es lo que se conoce en el argot electoral, un ejercicio de *get out the vote, el llamado GOTV*. Es decir, el propósito de esta ley no es verdaderamente alcanzar o como poco adelantar el ideal codiciado, sino sacar el voto a la calle de los correligionarios utilizando fondos públicos y el *imprimatur* mayoritario.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Orlando José Aponte Rosario, Hon. Rafael Hernández Montañez, Hon. José Varela Fernández, *et al.* Peticionarios v. Presidente Comisión Estatal de Elecciones; Estado Libre Asociado de Puerto Rico Recurrido _____ Luis Ricardo Vega Ramos Peticionario v. Presidente Comisión Estatal de Elecciones; Estado Libre Asociado de Puerto Rico Recurrido | MD-2020-002  Mandamus MD-2020-005 |

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ a la cual se unen la Jueza Presidenta ORONOZ RODRÍGUEZ y la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ.

En San Juan, Puerto Rico a 5 de octubre de 2020.

En el día de hoy, -- en un acto muy apasionado, pero poco pensado --, una mayoría de esta Curia decide revocar *sub silentio* lo sentenciado hace varias décadas por este Tribunal en el normativo caso *Báez Galib v. C.E.E*, *infra*, y, al así hacerlo, peligrosamente validan en nuestra jurisdicción el

uso de fondos públicos para adelantar la fórmula de estatus que propone el partido político en el poder. En este caso, ello también va atado a que los puertorriqueños y puertorriqueñas "puedan votar" por el Presidente y Vicepresidente de los Estados Unidos de América. Las repercusiones políticas, sociales y económicas de lo tristemente dictaminado por este Foro son y serán incalculables.

No albergamos duda alguna que el cuestionable proceder de una mayoría de este Tribunal choca frontalmente con lo dispuesto en las Constituciones del Estado Libre Asociado de Puerto Rico y de los Estados Unidos de América, y su jurisprudencia interpretativa. Como cuestión de hecho, así lo reconoció el Departamento de Justicia federal en una comunicación escrita cursada al entonces presidente de la Comisión Estatal de Elecciones del País, Lcdo. Juan E. Dávila Rivera[7]; exponiendo a esta Curia, una vez más, a tener que ser corregida por el Tribunal Supremo de los Estados Unidos, si así lo solicitasen las partes.[8] De ahí, la obligación de disentir.

---

[7]  Véase, Apéndice I (Comunicación escrita del Departamento de Justicia federal cursada al entonces presidente de la Comisión Estatal de Elecciones, Lcdo. Juan E. Dávila Rivera).

[8]  De la misma forma en que lo alertamos anteriormente en *Acevedo Feliciano v. Iglesia Católica, Apostólica y Romana*, 200 DPR 458 (2018) (Colón Pérez, opinión disidente) -- caso que fue expedido por el Tribunal Supremo de los Estados Unidos el 24 de febrero de 2020, *Roman Catholic Archdiocese of San Juan, Puerto Rico v. Yali Acevedo Feliciano, et al.*, 140 S. Ct. 696, 589 US __ (2020) -- llamamos la atención a que el caso ante nuestra consideración posee todos los elementos necesarios para ser revisado por la Corte Suprema federal.

No olvidemos que una de las controversias medulares del presente caso es el derecho al voto por el Presidente y

Una vez se revise el contenido de nuestra Opinión Disidente, notarán que los fondos públicos que hoy la mayoría de los miembros de este Foro autoriza se empleen en eventos simbólicos, elaborados en cuartos obscuros, y con aviesa intención, hubiesen servido un mejor propósito de haber ido a parar a las puertas de todos aquellos hogares de las familias puertorriqueñas que todavía sufren los estragos ocasionados por los huracanes Irma y María, los terremotos en la región suroeste del país, o la pandemia COVID-19; eventos que verdaderamente han dejado al descubierto la pobreza que se vive en esta Isla y las brechas económicas que triste e innecesariamente separan a unos de otros. ¡Quizás así, de una manera más real y acertada, podamos alcanzar la verdadera IGUALDAD que algunos de mis compañeros y compañeras de estrado reclaman en su escrito! Veamos.

I.

Los hechos medulares que dieron margen al presente litigio no están en controversia. Allá para el 16 de mayo de 2020, la Gobernadora de Puerto Rico, Hon. Wanda Vázquez Garced, firmó la Ley Núm. 51-2020, conocida como *Ley para la definición final del estatus político de Puerto Rico*, 2020 LPR

---

Vicepresidente de Estados Unidos, asunto contemplado por el Art. II, Sec. 1, de la Constitución federal. Véase lo resuelto por la Corte de Apelaciones para el Primer Circuito en Boston en *Igartúa de la Rosa v. USA*, infra.

**Hoy, el Tribunal Supremo de Puerto Rico, interpretando ligera y erróneamente la Constitución de los Estados Unidos e ignorando la legislación congresional relacionada, pretende concederle a los puertorriqueños y puertorriqueñas el derecho al voto por el Presidente y Vicepresidente de los Estados Unidos de América, cuando a todas luces ello en <u>derecho</u> no procede.**

51, a los fines de disponer el procedimiento para la celebración de un plebiscito sobre el estatus político de la Isla, simultáneo a las Elecciones Generales del 3 de noviembre de 2020.

Mediante el plebiscito propuesto se preguntará a los potenciales electores y electoras lo siguiente: "¿[d]ebe Puerto Rico ser admitido inmediatamente dentro de la Unión como un Estado?". Las alternativas de contestaciones a esa pregunta, las cuales estarán impresas en la papeleta de votación, serán *Estadidad "Sí" o "No".* Art. 4.1, 2020 LPR 51.

A grandes rasgos, la referida ley le ordena al presidente de la Comisión Estatal de Elecciones elaborar una propuesta o proyecto para el diseño general de una campaña educativa masiva a los electores y un proyecto de plan presupuestario para los demás gastos -- como la impresión de las papeletas -- los cuales deberán ser sometidos ante la consideración del Departamento de Justicia federal para el respectivo financiamiento. Art. 3.2, 2020 LPR 51. Para ello, se le ordena utilizar "todos los medios de comunicación y técnicas de difusión pública a su alcance, incluyendo medios electrónicos". Art. 4.5, 2020 LPR 51.

En cuanto a la asignación de fondos para llevar a cabo el plebiscito, el Art. 8.1, 2020 LPR 51, dispone que la Gobernadora, el Director Ejecutivo de la Oficina de Gerencia y Presupuesto, el Secretario de Hacienda y el Director Ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal de

Puerto Rico, tienen el deber ministerial de identificar y hacer disponibles los recursos económicos estatales asignados en la precitada ley -- aproximadamente $3,500,000.00 -- para cumplir con todos los propósitos de la misma, independientemente se hayan asignado fondos federales o no.

De otra parte, y poco más de un mes después, el 20 de junio de 2020 para ser exactos, se firmó la Ley Núm. 58 de 2020, conocida como *Código Electoral de 2020*, 2020 LPR 58. En lo pertinente a la controversia ante nuestra consideración, el mismo se legisló a los fines de integrar las disposiciones de la derogada Ley Núm. 12-2018, conocida como *Ley para Garantizar el Voto Presidencial a todos los Ciudadanos Americanos Residentes en Puerto Rico*, 2018 LPR 12 (derogada 2020). Art. 1.1, 2020 LPR 58.

Consecuentemente, en el Código Electoral recién aprobado se ordena que, en el mismo día de cada elección general, comenzando con la que se realice en el año 2024, todo ciudadano y ciudadana estadounidense que sea elector hábil en Puerto Rico, vote por su candidato de preferencia para Presidente y Vicepresidente de los Estados Unidos de América.[9]

---

[9] Resaltamos que, si bien el Art. 8.1.b del Código Electoral de 2020 establece las elecciones generales del año 2024 como punto de partida para la celebración de la primera elección presidencial en Puerto Rico, el Art. 8.22.b, por su parte, dispone:

> El lunes después del segundo miércoles de diciembre del año en que se realice la Elección Presidencial, el Presidente del Senado y el Presidente de la Cámara de Representantes de Puerto Rico, convocarán al Capitolio de Puerto Rico a los Compromisarios, de acuerdo con la certificación de elección emitida por el Presidente de la Comisión. Dichos Compromisarios, mediante votación secreta, emitirán sus votos de compromiso a favor de los Candidatos a Presidente

De igual manera, el referido Código le ordena a la Comisión Estatal de Elecciones organizar y viabilizar que los electores puertorriqueños emitan su voto para escoger entre los mencionados candidatos. Art. 8.3.b, 2020 LPR 51.

A la luz de lo anterior, varios legisladores y candidatos a dicho puesto (en adelante, "los peticionarios") acuden ante nos mediante el recurso extraordinario del *mandamus*, en el cual solicitan que se ordene al presidente de la Comisión Estatal de Elecciones y demás funcionarios, acatar la Constitución del Estado Libre Asociado de Puerto Rico y que no ejecuten la *Ley para la definición final del estatus político de Puerto Rico*, *supra*, así como lo dispuesto en el Código Electoral de 2020, *supra*, relativo al voto presidencial. Además, nos solicitan que -- mediante sentencia declaratoria -- ambas leyes sean declaradas inconstitucionales.

A esos efectos, éstos arguyen que las mencionadas leyes pretenden implementar ficticiamente un derecho legal inexistente y alterar la relación de poder entre Puerto Rico y Estados Unidos sin que el Pueblo lo haya autorizado. Asimismo, sostienen que dichas leyes persiguen objetivos inconstitucionales al autorizar el uso de fondos públicos para

---

y Vicepresidente de Estados Unidos a quienes representan. Los procesos de votación de los Compromisarios y su escrutinio, siempre se realizarán en el Capitolio de Puerto Rico. **Para la primera Elección Presidencial de 3 de noviembre de 2020, estos trabajos serán dirigidos por el Presidente de la Cámara en el hemiciclo de ese cuerpo legislativo y, en adelante, cada cuatro (4) años la dirección estos trabajos se alternará con el Presidente del Senado.** (Énfasis suplido). 2020 LPRA 58.

adelantar la fórmula de estatus que promueve el partido político en el poder -- lo cual, a juicio de éstos, carece de un fin público -- por lo que viola el principio de igualdad económica electoral inmerso en nuestra Constitución. Posteriormente, el Hon. Luis Vega Ramos presentó recursos de *mandamus* y sentencia declaratoria en los cuales realizó alegaciones similares a aquellas contenidas en los recursos presentados por los mencionados peticionarios. Por tanto, los recursos de referencia fueron consolidados.

Valga resaltar aquí que, en lo relacionado a la elección presidencial, los peticionarios no alegan hechos concretos que pongan de manifiesto el uso de fondos públicos para comenzar las labores concernientes a dicha elección junto a las elecciones generales que están próximas a celebrarse. Esto debido a que, como mencionamos anteriormente, varias disposiciones del Código Electoral de 2020, *supra*, contemplan la celebración de las primeras elecciones presidenciales en la Isla para el año 2024 y solo un artículo del referido estatuto, entiéndase el Art. 8.22b, establece el 3 de noviembre de 2020 como punto de partida.[10]

Por su parte, tanto el entonces presidente de la Comisión Estatal de Elecciones, Lcdo. Juan E. Dávila Rivera, como el Estado Libre Asociado de Puerto Rico presentaron sus

---

[10] Recordemos que, conforme a la doctrina de autolimitación judicial, este Foro debe evitar emitir opiniones consultivas en controversias que, entre otros, carezcan de madurez. Para superar dicho escollo, aquella parte que impugne la constitucionalidad de alguna disposición de ley, tal como ocurre en el caso de autos, viene obligada a demostrar la proximidad temporal del daño que la misma ha de ocasionarle. Véase, *Rexach v. Ramírez Vélez*, 162 DPR 130 (2004).

respectivos alegatos. En esencia, ambos sostienen que la Ley Núm. 51, *supra*, y las disposiciones sobre el voto presidencial contenidas en el Código Electoral de 2020, *supra*, persiguen un fin público y, por ende, ambas leyes son constitucionales. Por esta razón, nos solicitaron la desestimación de los recursos de epígrafe.

De igual forma, varias partes interesadas en el pleito comparecieron ante este Tribunal, a saber: el Senado de Puerto Rico, representado por su presidente, Hon. Thomás Rivera Schatz; el Partido Nuevo Progresista por conducto del presidente de la referida colectividad, Lcdo. Pedro R. Pierluisi Urrutia; el Lcdo. Gregorio Igartúa de la Rosa; y la actual Comisionada Residente en Washington, Hon. Jennifer A. González Colón. En apretada síntesis, los comparecientes arguyen que los estatutos impugnados promueven un fin público relacionado al bienestar general e igualdad de los puertorriqueños y puertorriqueñas y, en consecuencia, ambos son constitucionales por no contravenir el Art. VI, sec. 9, de la Constitución del Estado Libre Asociado de Puerto Rico.

Asimismo, el señor Eudaldo Báez Galib acudió ante esta Curia como *amicus curiae*. Este sostuvo que, ante la posibilidad de que se revoque lo resuelto en *Baéz Galib v. C.E.E*, *infra*, resultaba necesario destacar que los hechos en el caso ante nuestra consideración -- así como la normativa aplicable -- son en extremo similares a los que este Tribunal tuvo ante su consideración en el precitado caso del cual él fue parte. Es decir (1) el caso *Igartúa de la Rosa v. USA*,

*infra*, no ha sido revocado; (2) las disposiciones del voto presidencial contenidas en el actual Código Electoral, *supra*, son esencialmente las mismas contempladas en la ley que se declaró inconstitucional en *Báez Galib v. C.E.E.*, *infra*; y (3) la cláusula constitucional sobre el uso de fondos públicos según contemplada en el Art. VI, Sec. 9 de nuestra Constitución es la misma que fue interpretada en el mencionado caso.

Trabada así la controversia, y con el beneficio de la comparecencia de ambas partes en el litigio, así como de otras partes interesadas, procedemos a exponer la normativa aplicable a la misma.

II.

Como es sabido, el Art. VI, Sec. 9, de la Constitución del Estado Libre Asociado de Puerto Rico establece que "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". CONST. ELA art. VI, § 9, LPRA, Tomo 1. Cónsono con ello, hemos sentenciado que la noción de finalidad pública contemplada en la mencionada disposición constitucional juega un rol importante en nuestro ordenamiento jurídico, pues, a diferencia de las personas particulares -- quienes pueden actuar para variados fines -- "[l]a búsqueda de un fin de interés público es la condición positiva de toda actuación estatal". *Báez Galib v. C.E.E.*, *supra*. Véase, *P.I.P. v. C.E.E.*, 120 DPR 580, 606 (1988). De ese modo, todo organismo

gubernamental está obligado a cumplir cabalmente con la anterior disposición, lo cual se logra utilizando los fondos públicos para fines públicos legítimos. *Mun. de Quebradillas v. Corp. Salud Lares*, 180 DPR 1003, 1017 (2011); *C.F.S.E. v. Unión de Médicos*, 170 DPR 443, 452 (2007); *De Jesús Gonzalez v. AC*, 148 DPR 255, 268 (1999).

De conformidad con lo anterior, la Asamblea Legislativa tiene la facultad de asignar fondos públicos -- ya sea a entidades públicas, semipúblicas o aun privadas -- siempre que cumplan con una función reconocidamente pública y cuando el propósito de éstas sea colaborar en el desempeño de alguna labor gubernamental. Véase, 2 DIARIO DE SESIONES DE LA CONVENCIÓN CONSTITUYENTE 904-906 (1952). Véase, además, *P.S.P. v. ELA*, 107 DPR 590, 600 (1978). Es decir, los fondos del erario nunca se deben utilizar para el fomento de empresas privadas, ni para el beneficio de personas o entidades particulares en su condición como tales. Véase, DIARIO DE SESIONES, *supra.* Asimismo, es impermisible una asignación de fondos públicos que infrinja otras disposiciones de nuestra Carta Magna, como la igual protección de las leyes, la prohibición contra el uso de propiedades o fondos públicos para fines sectarios o el sostenimiento de instituciones educativas que no sean las del Estado, así como cualquier otro derecho que emane del Pueblo, conforme al sistema democrático que impera en nuestro País.[11] *P.S.P. v. ELA*, *supra*. Véanse, además, *Asoc. de Maestros v.*

*Depto. de Educación*, 200 DPR 974 (2018) (Colón Pérez, opinión disidente); *Asoc. Maestros P.R. v. Srio. Educación*, 137 DPR 528 (1994) (Fuster Berlingeri, opinión de conformidad); *Lemon v. Kurtzman*, 403 US 602 (1971).

Sobre el particular, hemos expresado que la determinación que realizan los poderes políticos en cuanto a lo que constituye un fin público merece gran deferencia por parte de los tribunales. *Báez Galib v. C.E.E.*, *supra*, págs. 395-96; *P.S.P. v. ELA*, *supra*. Por consiguiente, al ejercer nuestra función revisora y juzgar la validez constitucional de las actuaciones de las demás ramas de gobierno en torno al uso de fondos públicos para fines que éstas consideran como públicos, los parámetros que impone la doctrina de separación de poderes nos obligan a actuar con particular recelo, prudencia y deferencia hacia la voluntad legislativa. Véase, *P.P.D. v. Gobernador I*, 139 DPR 643, 685 (1995). Esto, "[s]iempre que la misma esté enmarcada dentro del esquema constitucional y aunque como magistrados discrepemos personalmente de la bondad de los actos legislativos". *P.I.P. v. C.E.E.*, *supra*, pág. 611. Véanse, además, *Báez Galib v. C.E.E.*, *supra*, págs. 394-96; *P.P.D. v. Gobernador I*, *supra*.

Ahora bien, lo anterior no significa que debamos abdicar nuestro rol como garantes e intérpretes finales de la Constitución del Estado Libre Asociado de Puerto Rico. Máxime, cuando se trata de la delicada tarea de evitar, a toda costa,

---

[11] Para una discusión sobre el uso de fondos públicos para el sostenimiento de instituciones educativas privadas, véase, *Asoc. de Maestros v. Depto.*

el derroche de fondos públicos en un país sumido en una lamentable crisis política, social y económica.

Así pues -- y teniendo como norte que nuestra Constitución es "más que una ley ordinaria, sino que es la ley que gobierna al gobierno" y como tal se impone sobre cualquier otra legislación -- **dicha deferencia no puede desembocar en el absurdo de que este Tribunal se cruce de brazos y permita que se deroguen fondos públicos para un fin claramente contrario a lo que el Art. VI, Sec. 9 de nuestra Constitución exige.** *PNP v. Calderón González*, 170 DPR 268, 294 (2007); *Báez Galib v. C.E.E.*, *supra*, pág. 396; *P.I.P v. C.E.E.*, *supra*, pág. 612. A ello no estamos dispuestos, no al menos el Juez que suscribe.

III.

De otra parte, la Constitución del Estado Libre Asociado de Puerto Rico también consagra el derecho al voto para toda persona domiciliada en el país, al disponer en su Art. II, Sec. 2, que las leyes adoptadas por la Asamblea Legislativa "garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". CONST. ELA art. II, § 2, LPRA, Tomo 1. De lo anterior podemos colegir que los funcionarios y las funcionarias gubernamentales a cargo de la dirección del País tienen una responsabilidad constitucional dual.

Por un lado, esos funcionarios y funcionarias tienen que abstenerse de interferir con el ejercicio del sufragio

---

*de Educación*, *supra* (Colón Pérez, opinión disidente).

universal, igual, directo y secreto, y, por otra parte, éstos tienen un deber afirmativo de proteger a los ciudadanos y ciudadanas contra toda coacción en el ejercicio de tal derecho. Ello, ya que en nuestro ordenamiento constitucional el poder político emana del consentimiento y de la libre selección y voluntad de los ciudadanos y ciudadanas que en este país habitan. *PPD v. Gobernador I*, *supra*, pág. 670. Véase, además, *Sánchez y Colón v. ELA I*, 134 DPR 445, 448-49 (1993)*.*

De conformidad con lo anterior, el Art. VI, Sec. 4, de nuestra Constitución esboza ciertas normas básicas para la celebración de los eventos electorales, así como los requisitos para poder participar en éstos. CONST. ELA art. VI, § 4, LPRA, Tomo 1. A la luz de este postulado, será elector o electora toda persona que haya cumplido dieciocho (18) años de edad y que reúna los demás requisitos que se determinen por ley. *Íd*. Además, y en lo pertinente a la controversia que nos ocupa, el referido artículo establece que "[s]e dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidatura". *Íd*. **Valga señalar que el derecho al voto de los puertorriqueños y las puertorriqueñas comprende no sólo el derecho a participar de las elecciones, sino que exige, además, que en las papeletas a utilizarse se incluyan las opciones que reflejan las corrientes políticas contemporáneas.** *PNP v. De Castro Font II*, 172 DPR 883, 893 (2007); *McClintock*

*Hernández v. Rivera Schatz*, 171 DPR 605 (2007); *P.A.C. v. ELA*, 150 DPR 359, 372 (2000).

Así pues, "[l]a Asamblea Legislativa tiene la facultad y la obligación de aprobar aquella reglamentación que, sin obstaculizar innecesariamente el derecho al voto en todas sus dimensiones, propenda a la realización de un proceso electoral justo, ordenado, libre de fraude, honesto e íntegro". *P.A.C. v. ELA*, 150 DPR 359 (2000); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 DPR 948 (1980); *P.S.P. v. Com. Estatal de Elecciones*, 110 DPR 400 (1980); *P.N.P. v. Tribunal Electoral*, 104 DPR 741 (1976). Ahora bien, aunque la referida rama de gobierno tiene amplia facultad para reglamentar los procesos electorales -- lo cual incluye las elecciones generales, primarias, plebiscitos y referéndums -- le corresponde a los tribunales, en el descargue de su responsabilidad para con el Pueblo, asegurar que la legislación promulgada a esos fines cumpla con las garantías constitucionales. *Sánchez y Colón v. ELA I*, *supra*, págs. 449-50; *Sánchez y Colón v. ELA II*, 134 DPR 503, 530 (1993) (Hernández Denton, opinión de conformidad).

En esos menesteres, es necesario que realicemos "[u]n delicado balance entre el derecho fundamental al sufragio y el interés del Estado en reglamentar su ejercicio para que el proceso se conduzca ordenadamente con la mayor participación de electores en igualdad de condiciones". *Íd.* Véase, además, *Burgos Andújar v. Com. Estatal de Elecciones*, 197 DPR 914, 986 (2017) (Colón Pérez, opinión disidente). Esto, pues, "[e]l Derecho Electoral concierne los derechos básicos de una

democracia y la legitimidad de sus elecciones, lo cual requiere un especial celo en actuar con el mayor cuidado y estudio". H. L. Acevedo, *La democracia puertorriqueña y su sistema electoral*, en *Puerto Rico y su gobierno: estructura, retos y dinámicas*, Puerto Rico, Ed. SM, 2016, pág. 297.

De igual forma, varios artículos y enmiendas de la Constitución de Estados Unidos de América abundan en lo concerniente al derecho al voto de los ciudadanos y ciudadanas estadounidenses. A esos fines, el Artículo II, Sec. 1, de la referida Constitución estipula que el proceso para elegir al Presidente y Vicepresidente de Estados Unidos será mediante el llamado Colegio Electoral, a través del cual los estados nombran varios electores o compromisarios. CONST. EE.UU. art. II, §1. Luego de que los ciudadanos y ciudadanas de los distintos estados voten por el candidato de su preferencia, estos compromisarios se reunirán y, a su vez, votarán, por el candidato que fue elegido mediante el voto popular. CONST. EE.UU. art. II, §1.

Asimismo, la Constitución de Estados Unidos de América prohíbe que el Gobierno Federal o los estados denieguen el derecho al sufragio por razón de raza, color, sexo o condición previa de servidumbre o a personas mayores de dieciocho (18) años.[12] Cada estado de la Unión tiene el deber de legislar en

---

[12] Véanse las enmiendas XV, XIX y XXVI de la Constitución de Estados Unidos. CONST. EE.UU. enm. XV, XIX y XXVI.

lo relativo al mencionado derecho teniendo en cuenta, claro está, los postulados constitucionales.[13]

Sobre este extremo, cabe resaltar que cada referencia al derecho al voto que se encuentra en la Constitución de Estados Unidos hace mención a los **estados** de la Unión, lo cual, en este momento, nos lleva a concluir que en Puerto Rico no existe el derecho a votar por el Presidente y Vicepresidente. Como cuestión de hecho, así lo entendió la Corte de Apelaciones para el Primer Circuito en Boston en *Igartúa de la Rosa v. USA*, 229 F. 3d 80 (2000).

En *Igartúa de la Rosa v. USA*, *supra*, varios ciudadanos estadounidenses domiciliados en Puerto Rico alegaron que se les estaba coartando su derecho a votar por los candidatos a Presidente y Vicepresidente de Estados Unidos. A juicio de éstos, ello era contrario a la cláusula constitucional sobre privilegios e inmunidades, el debido proceso de ley, la igual protección de las leyes, así como varios tratados internacionales que cobijan a los ciudadanos estadounidenses. *Igartúa de la Rosa v. USA*, *supra*, pág. 82.

Al revocar cierta determinación de la Corte de Distrito para el Distrito de Puerto Rico, la Corte de Apelaciones para el Primer Circuito en Boston razonó que el Art. II de la Constitución de Estados Unidos establece de manera explícita que el Presidente de Estados Unidos será elegido por los electores o compromisarios que cada **estado** escoja. *Igartúa de*

---

[13] Véase, el Art. II, Sec. 1 de la Constitución de Estados Unidos, CONST. EE.UU. art. II, §1.

*la Rosa v. USA*, *supra*, pág. 83. Debido a que Puerto Rico no es un estado de la Unión, éste no puede designar electores al Colegio Electoral. *Igartúa de la Rosa v. USA*, *supra*.

Consecuentemente, concluyó que, en ausencia de un cambio de estatus político en las relaciones de Puerto Rico y Estados Unidos o de una enmienda a la Constitución de este último -- tal cual ocurrió mediante la vigésima tercera enmienda, la cual le garantizó el derecho al voto a los residentes del Distrito de Columbia -- los ciudadanos estadounidenses domiciliados en Puerto Rico no tienen derecho a votar en las elecciones para elegir al Presidente y Vicepresidente. *Igartúa de la Rosa v. USA*, *supra*, págs. 83-84. Resaltamos que, anteriormente, en una controversia similar -- la cual involucraba las mismas partes -- la Corte Suprema de Estados Unidos denegó revisar la determinación de la Corte de Apelaciones para el Primer Circuito en Boston, en la que se resolvió que los ciudadanos de Estados Unidos domiciliados en Puerto Rico no tenían derecho al voto en las elecciones presidenciales.[14]

IV.

De otra parte, y por también considerarlo en extremo pertinente para la correcta disposición de las controversias que nos ocupan, resulta menester señalar aquí que la Constitución del Estado Libre Asociado de Puerto Rico, al igual que la Constitución de Estados Unidos de América,

---

[14] Véase, *Igartúa de la Rosa v. US*, 32 F. 3d 8 (1995) (*certiorari* denegado en *Igartúa v. US*, 514 US 1049)

consagra como principio fundamental el derecho a la igualdad e igual protección de las leyes. En lo pertinente, la Sección 1 de nuestra Carta de Derechos dispone que "[t]odos los hombres son iguales ante la ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana". CONST. ELA art. II, § 1, LPRA, Tomo 1. Mientras, el Art. II, Sec. 7 del referido documento establece que no se negará a persona alguna en Puerto Rico la igual protección de las leyes. CONST. ELA art. II, § 7, LPRA, Tomo 1.

Al respecto, esta Curia ha reconocido que "la igualdad es ingrediente medular del ideal de justicia que constantemente late en la Constitución. Por su naturaleza dinámica es susceptible de manifestarse en diversas dimensiones". *P.P.D. v. Gobernador I*, *supra*, págs. 666-67; *P.R.P. v. E.L.A.*, 115 DPR 631, 633 (1984). Una de esas dimensiones es la **igualdad electoral** recogida por el discutido Art. II, Sec. 2, pues la precitada disposición exige que el derecho al sufragio sea universal, **igual**, directo y secreto. CONST. ELA art. II, § 2, LPRA, Tomo 1.

En esa dirección, hemos sentenciado que los principios de igualdad electoral no son exclusivos de aquellas controversias que involucren a los partidos políticos, sino que su alcance debe trascender a otros contextos tal como lo sería el respeto a la voluntad del Pueblo y a que éste ejerza su derecho en

igualdad de condiciones. *Burgos Andújar v. Com. Estatal de Elecciones*, *supra*, pág. 975 (Colón Pérez, opinión disidente); *Guadalupe v. CEE*, 165 DPR 106, 117 (2005). **"Frente a la 'partidocracia', debe prevalecer la democracia", pilar básico de nuestra sociedad.** *Íd.*

Los principios antes expuestos, sin lugar a dudas, se socavarían si, por ejemplo, aváláramos -- como así lo ha hecho una mayoría de este Tribunal en el día de hoy -- que se adopte legislación que le otorgue una ventaja indebida a un partido político por encima del otro, tal como lo sería utilizar fondos públicos para promover la postura del partido político en el poder. En otras palabras, "[t]oda actuación que tienda a crear una desigualdad indebida o desventaja no justificada en unos partidos políticos y otros es constitucionalmente impermisible". *Acevedo Vilá v. Com. Estatal de Elecciones*, 172 DPR 971, 986 (2007). Véase, *P.N.P. v. Srio. de DTOP*, 122 DPR 362 (1988). **Así pues, "[n]o se puede dejar que los que están adentro decidan por quienes se quedan fuera".** H.L. Acevedo, *op. cit.* (citando a John Hart Ely, *Democracy and Distrust*, Harvard University Press, 1980, pág. 120).

Al respecto, resulta necesario repasar pasada jurisprudencia de este Tribunal en tan sensitivo asunto, donde, de conformidad con el ordenamiento democrático imperante en nuestra jurisdicción -- el cual se cimenta en el derecho al sufragio universal e igual --, esta Curia reconoció lo que hasta el 2005 se denominó como el "axioma constitucional de igualdad electoral". "En el espectro de ese

axioma loable, este Tribunal interpretó que nuestra Constitución exige ciertos derechos y garantías adicionales al acto formal del voto". *Burgos Andújar v. Com. Estatal de Elecciones*, *supra*, pág. 947 (Oronoz Rodríguez, opinión disidente).

Sobre el particular, a grandes rasgos, y en separadas instancias, esta Curia sostuvo que el axioma de igualdad electoral requería, entre otros, lo siguiente: (1) la igualdad de participación de los partidos en el Fondo Electoral; (2) igualdad en la participación de los partidos por petición junto con los partidos principales en la administración de la Comisión Estatal de Elecciones; (3) prohibición del uso de vehículos públicos en campañas políticas; (4) prohibición del uso de fondos públicos para campañas gubernamentales antes de un referéndum para enmendar la Constitución; (5) prohibición del uso de fondos públicos para campañas gubernamentales que benefician al partido en el poder; y (6) inconstitucionalidad de una ley para votar por el Presidente de Estados Unidos.[15] Véase, J. J. Álvarez Gonzalez, *Derecho Constitucional de Puerto Rico y Relaciones con los Estados Unidos: Casos y Materiales*, Bogotá, Ed. Temis, 2009, págs. 965-67.

Ahora bien, en *Burgos Andújar v. Comisión Estatal de Elecciones*, *supra*, una mayoría de este Tribunal -- en clara contravención de la doctrina del precedente -- revocó el hasta

---

[15] Véanse, *P.S.P. v. Srio. de Hacienda*, 110 DPR 313 (1980); *P.S.P. v. Com. Estatal de Elecciones*, *supra*; *Marrero v. Mun. de Morovis*, 115 DPR 643 (1984); *P.P.D. v. Gobernador II*, *supra*; *P.P.D. v. Gobernador I*, *supra*; *Miranda v. Com. Estatal de Elecciones*, 141 DPR 775, 786 (1996); *Báez Galib v. C.E.E.*, *supra*.

entonces normativo caso de *P.P.D. v. Gobernador II*, 139 DPR 916 (1994), en el cual se levantaba el axioma de igualdad electoral, tras razonar que tal axioma era inexistente en nuestro ordenamiento jurídico. En dicha ocasión, quien suscribe -- al igual que lo hace hoy mediante esta Opinión Disidente -- reafirmó la existencia y relevancia del mencionado axioma, al expresar que "[n]o exist[ía] duda de que ... el principio de igualdad inmerso en nuestra Constitución se manif[estaba], entre otras, en los asuntos electorales, trátese de una elección general, plebiscito o referéndum", por lo que "no pod[íamos] permitir una ventaja indebida del partido que esté en el Gobierno para promover su postura mediante la utilización de fondos públicos". *Burgos Andújar v. Com. Estatal de Elecciones*, *supra*, pág. 992.

Lo anterior, bajo el fundamento de que "[h]istóricamente, el ideal de la igualdad en el contexto eleccionario se ha erigido sobre esquemas para el financiamiento de los partidos políticos y de los procesos electorales". *Burgos Andújar v. Com. Estatal de Elecciones*, *supra*, pág. 966 (Rodríguez Rodríguez, opinión disidente). Dicho esquema pretende combatir el "inversionismo" político, así como garantizar la distribución igualitaria de bienes o subsidios directos e indirectos. *Íd.*

Finalmente, en aquel momento, quien suscribe, expresó que la decisión a la que llegó la mayoría del Tribunal "avala[ba] que el partido político que ocupa el poder utili[zase] los fondos públicos para interferir -- intencionalmente -- con el

libre derecho al voto de los puertorriqueños y las puertorriqueñas a ser depositado en las urnas de la democracia, socavando así los pilares del esquema electoral de nuestro país". *Burgos Andújar v. Com. Estatal de Elecciones*, *supra*, pág. 978. Hoy, lamentablemente, nos encontramos ante otro episodio de tan triste saga.

V.

Por otro lado, previo a disponer de los asuntos que nos ocupan, conviene recordar aquí que la legislación objeto del presente litigio le requirió al entonces Presidente de la Comisión Estatal de Elecciones, Lcdo. Juan E. Dávila Rivera, entregarle al Secretario del Departamento de Justicia federal, en lo concerniente a la controversia ante nuestra consideración, lo siguiente: (a) un borrador de la papeleta de votación del plebiscito; (b) una propuesta para el diseño general de la campaña de educación a los electores sobre el plebiscito la cual debe ser objetiva y no partidista y con un presupuesto total que no excederá dos millones de dólares ($2,000,000); y (c) un proyecto de plan presupuestario para los demás gastos del plebiscito, tales como los costos de impresión de papeletas, lo cual no excederá de un millón quinientos mil dólares ($1,500,000). Art. 3.2, 2020 LPR 51.

**Los anteriores requisitos se exigían pues, conforme a la Ley Pública 113-76 de 2014, conocida como *Consolidated Appropriations Act,* 128 Stat. 5, así como el Informe Congresional que le acompaña, H.R. Rep No. 113-71 (2014), el Secretario del Departamento de Justicia Federal era el**

**funcionario encargado de certificar los materiales, autorizar la celebración del plebiscito y, consecuentemente, autorizar el desembolso de ciertos fondos federales.** Ello, pues, a través de la precitada ley, el Congreso asignó $2,500,000 para la educación objetiva y no partidista de los electores en un plebiscito sobre el estatus político de Puerto Rico con los Estados Unidos.

Así pues, y a raíz de la petición de fondos federales realizada por el entonces Presidente de la Comisión Estatal de Elecciones al Departamento de Justicia de los Estados Unidos, el 29 de julio de 2020 la referida agencia federal le remitió a éste una misiva atendiendo lo relativo al plebiscito propuesto.[16] **En la misma, el Departamento de Justicia de los Estados Unidos enumeró sus objeciones a la celebración de este evento, no solo en lo procesal -- ya que la Comisión no le proveyó los documentos con la antelación requerida para que los mismos pudieran ser revisados de manera completa y eficaz, ello debido a la complejidad del proceso de certificación -- sino también en términos sustantivos.**

En cuanto al aspecto sustantivo, la mencionada agencia federal demostró serias preocupaciones con los materiales sometidos por la Comisión Estatal de Elecciones, por entender que los mismos eran contrarios a la política de los Estados Unidos. Al respecto, advirtió lo siguiente:

> First, the United States has consistently remained neutral about the legally permissible status options for the

---

[16] Véase, Apéndice I.

> Commonwealth of Puerto Rico – Statehood, continued territorial status, and independence (including free association) – maintaining that **the people of Puerto Rico, not the federal government, should determine their preference among options for the islands' future status that are not incompatible with the Constitution and basic laws and policies of the United States.** (Énfasis suplido).[17]

No obstante, continuó expresando que múltiples aspectos de la Ley Núm. 51-2020, *supra*, demuestran que el plebiscito aborda la pregunta sobre el estatus político futuro de Puerto Rico desde una perspectiva pro-estadidad.[18] En ese sentido, la aprobación y financiamiento de dicho evento por parte del Departamento de Justicia de Estados Unidos podría ser visto como un respaldo de dicha postura -- entiéndase, la Estadidad -- y un rechazo a las demás opciones de estatus.

Así también, el Departamento de Justicia de los Estados Unidos entendió que dicha percepción es altamente probable pues el Art. 4.4(b) de la Ley Núm. 51-2020 propone que en las papeletas del plebiscito se disponga que el mismo es promovido y apoyado por el Gobierno de los Estados Unidos de América, con los fondos asignados bajo la Ley Pública 113-76 de 2014, *supra*. Sobre este extremo, resaltó que "while the Department would not object, in appropriate circumstances, to a similar statement endorsing an objective, non-partisan plebiscite process, it must do so here, when such a statement would imply

---

[17] *Íd*. en la pág. 2.

[18] *Íd*. en la pág. 3.

that the United States has departed from its policy of neutrality to endorse a pro-Statehood initiative".[19]

En segundo lugar, la referida misiva rechazó la base sobre la cual el plebiscito propuesto parece estar cimentando, es decir, la contención de que los plebiscitos celebrados en los años 2012 y 2017 significaron un rechazo directo al actual estatus.[20] Respecto al plebiscito de 2012, la mencionada agencia federal reiteró los pasados señalamientos de que la validez de los resultados de dicho proceso electoral estaba en controversia y que era incierto si éstos, en efecto, reflejaban la voluntad actual del Pueblo.[21] Mientras, en cuanto al plebiscito de 2017,[22] el Departamento de Justicia de los Estados Unidos señaló que el rechazo de las papeletas en aquel momento -- por ser incompatibles con las leyes y la política de los Estados Unidos --, y la baja participación del electorado, le impedía considerar el mismo como una decisión del Pueblo a favor de la Estadidad.[23]

Consecuentemente, sentenció que la base para la papeleta propuesta *Estadidad*, "Sí" o "No" -- entiéndase la aprobación

---

[19] *Íd.*

[20] *Íd.*

[21] *Íd.*

[22] Valga señalar que la declaración de política pública contenida en el Art. III de la *Ley para la descolonización inmediata de Puerto Rico de 2017*, 16 LPRA sec. 975 *et seq.*, que dio a lugar al plebiscito celebrado en el 2017, resaltó, en varias ocasiones, que las alternativas de estatus allí propuestas -- estadidad, libre asociación/independencia o actual estatus territorial -- eran cónsonas con la Constitución y las leyes de Estados Unidos. Es decir, en ese momento la referida ley reconoció la importancia de que el mencionado evento electoral intentara ajustarse a la Constitución federal. No vemos, pues, razón por la cual la legislación y jurisprudencia federal no sean pertinentes para la correcta disposición de las controversias ante nuestra consideración.

que refleja la Ley Núm. 51-2020 hacia los pasados dos plebiscitos -- conflige con la política pública de los Estados Unidos a los efectos de que el Pueblo de Puerto Rico no ha rechazado en definitiva el Estado Libre Asociado.[24]

Finalmente, el Departamento de Justicia federal se mostró preocupado por el contenido de los materiales a utilizarse en el plebiscito, por entender que los mismos pueden ocasionar que los electores malinterpreten el efecto de un resultado mayoritario a favor de la Estadidad. Lo anterior, ya que ello no implica la admisión automática o inmediata como estado de la Unión.[25]

A la luz de lo antes esbozado, **el Departamento de Justicia de los Estados Unidos no aprobó los materiales sometidos para el plebiscito de 3 de noviembre de 2020 y, por tanto, se vio impedido de asignar los fondos que proveía la Ley Pública 113-76 de 2014,** *supra*. Dicha conclusión implica que, de proseguir con la celebración del mencionado plebiscito, le correspondería a los funcionarios enumerados en el Art. 8.1, 2020 LPR 51, identificar y utilizar para esos fines los fondos con los que cuenta el Estado Libre Asociado de Puerto Rico.

Es menester resaltar que lo expresado en la misiva anterior -- a los fines de aclarar que es el Pueblo de Puerto Rico, y no el gobierno federal, quien debe determinar su preferencia para el estatus político futuro de la Isla -- es

---

[23] *Íd.*
[24] *Íd.* en las págs. 3-4.

cónsono con lo dispuesto en la Ley Pública Núm. 600 de 3 de julio de 1950, conocida como *Ley de relaciones federales con Puerto Rico*, LPRA, Tomo 1; 64 Stat. 319. Sobre ello, basta con repasar lo recientemente expresado por la Juez Asociada del Tribunal Supremo de los Estados Unidos, Hon. Sonia Sotomayor, en *Financial Oversight and Management Bd. for Puerto Rico v. Aurelius Investment, LLC*, 140 S. Ct. 1649, 590 US ___ (2020), en cuanto a la relación política entre Puerto Rico y los Estados Unidos. Y es que, en su Opinión Concurrente en el precitado caso, la Juez Sotomayor expone -- de manera muy acertada -- los eventos que dieron paso a la creación de nuestro propio ordenamiento constitucional, cuyo poder político emana de la voluntad del Pueblo.

En el referido escrito, -- con un dominio particular del tema --, la Juez Sotomayor nos relata que, allá para el año 1950, el Congreso de los Estados Unidos aprobó la Ley Pública 600 de 3 de julio de 1950 a los fines de permitirle a Puerto Rico emprender en un proyecto constitucional de gobierno propio. *Íd.* en la pág. 1672. Véase, además, *Puerto Rico v. Sánchez Valle*, 136 S. Ct. 1863, 1868, 519 US ___ (2016). La referida legislación ofreció a los puertorriqueños un acuerdo, bajo el cual éstos podrían organizar un gobierno bajo su propia Constitución. *Financial Oversight and Management Bd. for Puerto Rico v. Aurelius Investment*, *supra*, pág. 1672. En

---

[25] *Íd.* en la pág. 4.

ese sentido, la Ley Pública Núm. 600 reconoció y afirmó el principio de gobierno por consentimiento del Pueblo.

Ahora bien, dicha ley -- además de ser aprobada por el Congreso -- tenía que contar con el aval del Pueblo de Puerto Rico, por lo que fue presentada a éste mediante referéndum. *Íd.* Una vez la precitada ley fue respaldada por la mayoría de los electores, la Asamblea Legislativa convocó a una convención constitucional, con el fin de preparar un borrador de Constitución que creara un gobierno de forma republicana e incluyera una carta de derechos. *Íd.* Este borrador de Constitución fue sometido a un referéndum especial para la consideración del Pueblo.

Así pues, en el año 1952 el Pueblo puertorriqueño aprobó el borrador de Constitución y, posteriormente, el Congreso de Estados Unidos le realizó ciertas modificaciones, con la salvedad de que la misma "shall become effective only when Puerto Rico declare[s] in a formal resolution its acceptance". 66 Stat. 327. Véase, *Financial Oversight and Management Bd. for Puerto Rico v. Aurelius Investment, supra.* Mediante un subsiguiente referéndum, el referido documento se convirtió en lo que hoy conocemos como la Constitución del Estado Libre Asociado de Puerto Rico. A pesar de que los términos del acuerdo proveían para la aprobación del Congreso, cuando nuestra Constitución comenzó a regir, ésta se convirtió en lo que el Congreso llamó "a 'constitution' under which the people of Puerto Rico organized a government of their own adoption". *Íd.*

A partir de la aprobación de la Ley 600 y el reconocimiento de nuestra Constitución, Estados Unidos y Puerto Rico forjaron una relación política única cimentada en la evolución de la isla a una democracia constitucional. *Íd.* De hecho, "poco después de que el Congreso aprobara la Constitución de Puerto Rico, los oficiales federales le indicaron a las Naciones Unidas expresamente que el acuerdo era de naturaleza bilateral, y como tal sus términos podían ser alterados solo mediante el consentimiento mutuo". (Traducción suplida). *Íd.* en la pág. 1675.

Finalmente, la Juez Sotomayor manifiesta que este acuerdo, y los subsiguientes desarrollos históricos y jurídicos, tales como la jurisprudencia de la Corte Suprema de Estados Unidos, indican que el Congreso dejó en manos de los habitantes de Puerto Rico la autoridad para establecer su propio gobierno. *Íd.* en la pág. 1677. Sus expresiones fueron validadas anteriormente por el máximo foro federal en *Puerto Rico v. Sánchez Valle*, *supra*.

Asimismo, resaltamos que la anterior fórmula -- entiéndase, la voluntad del Pueblo como factor determinante en el estatus político futuro de Puerto Rico -- es precisamente la postura que promueve el Gobierno Federal, pues así surge de la misiva del Departamento de Justicia rechazando la aprobación y financiamiento del plebiscito propuesto mediante la Ley Núm. 51-2020, 2020 LPR 51.

Por consiguiente, y de conformidad con nuestra Carta Magna, el poder del Estado Libre Asociado de Puerto Rico emana

del Pueblo y el mismo debe ser ejercido conforme a su voluntad y dentro de los términos del acuerdo entre el Pueblo de Puerto Rico y los Estados Unidos. Con ello en mente, **al resolver las controversias ante nuestra consideración, este Tribunal debe partir de la premisa de que vivimos en un ordenamiento constitucional donde impera la ley y no las voluntades individuales.** *Acevedo Vilá v. Aponte Hernández*, 168 DPR 443, 451 (2006). Ese ordenamiento constitucional, históricamente, ha reconocido y reconoce como fórmulas de estatus -- a considerarse en todo evento plebiscitario por los electores y electoras puertorriqueñas -- el Estado Libre Asociado, la Estadidad y la Independencia.[26]

VI.

---

[26] Sobre la naturaleza del Estado Libre Asociado de Puerto, el Tribunal Supremo de los Estados Unidos, en *Puerto Rico v. Sánchez Valle*, *supra*, expresó que:

> The Puerto Rico Constitution created a new political entity, the Commonwealth of Puerto Rico or, in Spanish, Estado Libre Asociado de Puerto Rico. Like the U.S. Constitution, it divides political power into three branches—the 'legislative, judicial and executive.' Art. I, § 2. And again resonant of American founding principles, the Puerto Rico Constitution describes that tripartite government as 'republican in form' and 'subordinate to the sovereignty of the people of Puerto Rico.' The Commonwealth's power, the Constitution proclaims, 'emanates from the people and shall be exercised in accordance with their will, within the terms of the compact agreed upon between the people of Puerto Rico and the United States.'" (Citas omitidas).

Asimismo, y tras expresar que la relación entre Puerto Rico y Estados Unidos es única en su historia, razonó que los desarrollos constitucionales en la Isla "made Puerto Rico 'sovereign' in one commonly understood sense of that term. As this Court has recognized, Congress in 1952 'relinquished its control over [the Commonwealth's] local affairs[,] grant[ing] Puerto Rico a measure of autonomy comparable to that possessed by the States.'" *Puerto Rico v. Sánchez Valle*, *supra*, pág. 1874.

Sobre lo antes esbozado, resultaba altamente vinculante lo resuelto por esta Curia hace veinte (20) años atrás en *Báez Galib v. C.E.E.*, *supra*, precedente que hoy una mayoría de este Tribunal, a nuestro juicio, -- *sub silentio* y tras una interpretación acomodaticia -- revoca. En el precitado caso, varios funcionarios de la Comisión Estatal de Elecciones, así como otros funcionarios electos (en adelante, "peticionarios"), presentaron ciertos recursos de *mandamus* mediante los cuales impugnaron la Ley Núm. 403-2000, 16 LPRA sec. 961 *et seq.*, firmada por el entonces Gobernador, Hon. Pedro Roselló González.

La precitada ley les impuso a éstos organizar y celebrar en la jurisdicción del Estado Libre Asociado de Puerto Rico una elección para elegir compromisarios que eventualmente votarían por el Presidente y Vicepresidente de Estados Unidos. Dicha elección presidencial, al igual que en la Ley 58-2020 aquí en controversia, se definió como "[e]l proceso mediante el cual los electores emiten su voto para **expresar su preferencia** en cuanto a los candidatos nominados para los cargos de Presidente y Vicepresidente de los Estados Unidos de América, mediante la designación de compromisarios...". 16 LPRA sec. 961. El referido evento electoral se realizaría de forma simultánea con las Elecciones Generales de 7 de noviembre de 2000. *Báez Galib v. C.E.E.*, *supra*, pág. 386. Asimismo, autorizaba el uso de fondos públicos para llevar a cabo todos los procesos relacionados al evento y le asignó a la Comisión la cantidad de novecientos mil dólares ($900,000)

de fondos no comprometidos del Tesoro Estatal. *Íd.* en la pág. 387.

Los peticionarios adujeron que la referida ley constituía un ejercicio inconstitucional de autoridad legislativa en violación del Art. II, Sec. 19, de la Constitución del Estado Libre Asociado de Puerto Rico, ya que pretendía implementar un derecho legal inexistente y alterar la relación de poder entre Puerto Rico y Estados Unidos sin la autorización del Pueblo. Además, arguyeron que la misma era inconstitucional pues asignaba fondos públicos a pesar de que el propósito no era un fin público legítimo -- ello en contravención del Art. VI, Sec. 9 de nuestra Constitución -- y que mediante ésta se pretendía adelantar la causa de la Estadidad, por lo que se violaba el principio de igualdad económica inmerso en la anterior disposición constitucional.

Al disponer de las referidas controversias, este Tribunal expresó que el cumplimiento de la Ley Núm. 403-2000 infringía un deber ministerial de mayor jerarquía, entiéndase, aquel dispuesto por la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, que requiere a todo funcionario público la obligación de utilizar los fondos del erario para fines públicos. En consecuencia, la Comisión Estatal de Elecciones y sus funcionarios tenían el deber ministerial de abstener de utilizar los recursos públicos para los objetivos de la precitada ley.

De igual forma, en *Báez Galib v. C.E.E.*, *supra*, esta Curia repasó lo resuelto en *Igartúa de la Rosa v. USA*, *supra*,

y sentenció que la Constitución de Estados Unidos solo le reconocía el derecho al voto presidencial a los ciudadanos domiciliados en alguno de los estados de la Unión o en el Distrito de Columbia. Además, aclaramos que ni la Constitución del Estado Libre Asociado de Puerto Rico ni la *Ley de relaciones federales con Puerto Rico*,*supra*, permitía la realización de un evento electoral en esta jurisdicción para que las personas aquí domiciliadas eligieran compromisarios. Ya que se trataba de una legislación sin consecuencia jurídica alguna -- por ser contraria a la Constitución federal así como la nuestra -- sostuvimos que no existía un fin público para satisfacer la exigencia constitucional antes esbozada.

Conforme a lo anterior, establecimos que en ausencia de un fin público discernible y definido, era evidente que el propósito de la legislación en aquel momento en controversia era únicamente político-partidista, lo cual es ajeno a lo dispuesto en nuestra Constitución sobre el uso de fondos públicos. **Debido a que la Constitución del Estado Libre Asociado de Puerto Rico no favorecía, ni favorece, alternativa de estatus alguna, concluimos que utilizar los fondos públicos para adelantar la causa de uno solo de los partidos políticos -- entiéndase, la Estadidad -- era inconstitucional.** Señalamos allí:

> Su texto es neutral al destino político del país. Cualquier medida legislativa o gubernamental que tenga el efecto de inclinar la balanza a favor de alguna alternativa de estatus sin que tenga la aprobación de los puertorriqueños, infringe el esquema de neutralidad que al respecto se deriva de

nuestra Constitución. *Báez Galib v. C.E.E.*, *supra*, pág. 400.

Es el Pueblo de Puerto Rico quien ostenta la facultad de procurar cambios de estatus.

Asimismo, y en lo concerniente al axioma constitucional de igualdad electoral de los partidos políticos, en *Báez Galib v. C.E.E.*, *supra*, concluimos que la legislación impugnada violaba el mismo "[e]n la medida en que prom[ovía] una práctica electoral que e[ra] cónsona con una fórmula de estatus que sólo propugna[ba] un partido político, en este caso, el Partido Nuevo Progresista", inclinando la balanza a favor de la alternativa de estatus defendida por dicha entidad. Consecuentemente, resolvimos que la asignación de fondos públicos con el fin de poner en ejecución la Ley Núm. 403-2000 era impermisible, debido a que socavaba el esquema democrático de neutralidad gubernamental en los asuntos de estatus.

Indudablemente, este era el precedente -- uno bien pensado, estudiado y elaborado -- que esta Curia estaba obligada a seguir. Tristemente, la interpretación que, en el día de hoy, se realiza sobre el mismo, pretende soslayar el criterio rector allí pautado, entiéndase el principio de neutralidad que recoge nuestra Constitución.

VII.

Por último, no podemos obviar lo concerniente al valor del precedente y la doctrina del *stare decisis* que rige en el ordenamiento jurídico puertorriqueño. Este concepto proviene del latin *stare decisis et non quieta movere*, lo cual

significa mantenerse con lo decidido y no perturbar la calma. Véase, *Ramos v. Louisiana*, 140 S. Ct. 1390, 590 US ___ (2020) (Sotomayor, opinión concurrente); *Townsend v. Jemison*, 50 US 407 (1850). El propósito de esa doctrina es que un tribunal, en aras de proveer certidumbre y estabilidad en las relaciones jurídicas en el país, siga sus dictámenes previos. *Rivera Ruiz v. Mun. de Ponce*, 196 DPR 410, 429 (2016). Véase, además, *Am. Railroad Co. v. Comisión Industrial*, 61 DPR 314, 326 (1943). Ello, como elemento esencial para generar la confianza de los ciudadanos y ciudadanas en su sistema de justicia. *Asoc. de Maestros v. Dpto. de Educación*, *supra*, pág. 1110 (Colón Pérez, opinión disidente).

Ahora bien, esta doctrina admite excepciones, por lo que los tribunales no están llamados a seguir un precedente cuando esté presente alguna de las siguientes circunstancias: (a) el precedente establecido fue claramente erróneo; (b) sus efectos sobre el ordenamiento sean adversos; o (c) la cantidad de personas que confiaron en éste fuese limitada. *Pueblo v. Camacho Delgado*, 175 DPR 1, 20 esc. 4 (2008). Véase, además, *González v. Merck*, 166 DPR 659, 688 (2006). Sin lugar a duda, dichas excepciones no están presentes en el caso de autos.

Es, precisamente, a la luz de la normativa antes expuesta, y no de otra, que procedía disponer de las controversias ante nuestra consideración. Como una mayoría de este Tribunal no lo hizo, procedemos -- desde el disenso -- a así hacerlo.

VIII.

Conforme mencionáramos anteriormente, en el presente caso los peticionarios aducen que la Ley Núm. 51-2020 y la Ley Núm. 58-2020 son inconstitucionales, pues alteran la relación de poder entre Puerto Rico y Estados Unidos sin que el Pueblo lo haya autorizado. Además, sostienen que dichas leyes persiguen objetivos inconstitucionales al autorizar el uso de fondos públicos para adelantar la fórmula de estatus que promueve el partido político en el poder, lo cual, a juicio de éstos, carece de un fin público. Les asiste la razón. El normativo caso de *Báez Galib v. C.E.E.*, *supra*, así claramente lo establecía.

No empece a ello, en un lamentable proceder, la mayoría de los miembros de esta Curia nuevamente obvia el valor del precedente y revoca *sub silentio* el precitado caso. Al así hacerlo, erróneamente resuelven que las leyes aquí en controversia persiguen un fin público legítimo. Sostienen que el mismo se cumple al permitir a todos los puertorriqueños y puertorriqueñas participar y expresarse a favor o en contra de ratificar la fórmula de estatus que, a juicio de éstos, resultó favorecida en los plebiscitos de 2012 y 2017.

Para llegar a la anterior conclusión, interpretan que *Báez Galib v. C.E.E*, *supra*, condicionó la constitucionalidad de aquella ley que incline la balanza a favor de alguna de las alternativas de estatus, a que se tuviese la aprobación previa de los puertorriqueños y puertorriqueñas. Acto seguido, manifiestan que el pueblo puertorriqueño expresó su voluntad a favor de la Estadidad en dos ocasiones anteriores a los

eventos electorales que las leyes aquí en controversia convocan, por lo que se cumple con el estándar requerido en *Báez Galib v. C.E.E*, *supra*; soslayando con su actuación el principio constitucional de neutralidad allí reafirmado.[27]

En ese sentido, la Opinión Mayoritaria sostiene que los resultados de los plebiscitos de 2012 y 2017 reflejaron el mandato inequívoco del Pueblo sobre la preferencia de éste en cuanto al estatus político de Puerto Rico. Plebiscitos que, como es sabido, no tuvieron efecto jurídico-político alguno, lo que motivó al legislador a, nuevamente, radicar legislación muy similar -- y con iguales defectos a los aquí discutidos -- dirigida a atender el mismo asunto.

Esto, pues, en cuanto al plebiscito celebrado en el 2012, las instrucciones contenidas en la papeleta requerían que -- independientemente que en la primera pregunta se contestara que se favorecía o no se favorecía el estatus territorial actual -- se eligiera algunas de las opciones de estatus contenidas en la segunda pregunta. No obstante, en ésta no se

---

[27] En cuanto al requisito de neutralidad exigido por nuestra Constitución y reafirmado en *Báez Galib v. C.E.E.*, *supra*, curiosamente, la Opinión Mayoritaria se contradice en más de una ocasión -- nuevamente, a su conveniencia -- en cuanto a la aplicabilidad o no del mismo. En la página 4 sostienen que no se puede invocar el principio de neutralidad para frustrar la voluntad de los puertorriqueños, lo cual a su entender no existía cuando esta Curia resolvió dicho caso. No obstante, posteriormente, citan con aprobación *Suárez Cáceres v. Com. Estatal de Elecciones*, 176 DPR 31 (2009), a los fines de expresar que "[e]s particularmente nocivo y contrario al mandato constitucional de neutralidad inyectar un elemento totalmente subjetivo y especulativo en la adjudicación de los votos". *Íd.* en la pág. 91.

Por su parte, en la pág. 40 se expresa que "[n]o se puede invocar el principio de neutralidad ni tampoco invocar una alegada desigualdad para fosilizar la voluntad del pueblo". Empero, más adelante, sostienen su postura en cuanto a la inexistencia del *axioma constitucional de igualdad electoral*, y aducen que "[l]o correcto es referirnos al principio de neutralidad, ya que, según explicamos, la Constitución no favorece ninguna fórmula específica de estatus". Véase, pág. 49 de la Opinión Mayoritaria.

incluyó una opción para expresar la preferencia de los electores por el Estado Libre Asociado.[28] Lo anterior tuvo el efecto de reflejar un resultado ilusorio a favor de la Estadidad que realmente no representó el sentir mayoritario de las puertorriqueñas y los puertorriqueños que salieron a votar en las urnas.

Mientras, en lo relacionado al plebiscito del 2017, es harto conocido que solo el 23% de los electores hábiles en Puerto Rico participaron en el mismo; es decir, aproximadamente 518,000 de 2.3 millones de electores. Ello, precisamente, debido a que la manera en que se formuló la papeleta excluyó la participación de amplios sectores de la población y no permitió el aval del Gobierno Federal.[29]

A la luz de todo lo anterior, nos vemos en la obligación de reiterar nuestras expresiones previas en *Asoc. de Maestros v. Dpto de Educación*, *supra*, a los efectos de que "[n]os resulta altamente preocupante la regularidad con la que una mayoría de este Tribunal, en tiempos recientes, ha optado por obviar el valor que tiene el precedente en todo ordenamiento jurídico. **Máxime, cuando se hace para validar el uso de fondos**

---

[28] Además, existe controversia respecto a de qué manera, si alguna, se consideraron las 498,604 papeletas en las cuales se dejó en blanco la segunda pregunta sobre las distintas opciones de estatus. Así pues, no podemos perder de perspectiva que dichas papeletas inciden en el porcentaje de aquellos electores que favorecieron la Estadidad en el año 2012 y, consecuentemente, cuan representativos son dichos resultados. Véase, Congressional Research Service, *Puerto Rico's Political Status and the 2012 Plebiscite: Background and Key Questions*, https://fas.org/sgp/crs/row/R42765.pdf (última visita 3 de octubre de 2020).

[29] Véase, Congressional Research Service, *Political Status of Puerto Rico: Brief Background and Recent Developments for Congress*, https://fas.org/sgp/crs/row/R44721.pdf (última visita 3 de octubre de 2020).

**públicos para fines privados**". *Íd*. en la pág. 1111. En esa instancia, la preocupación es doble y nuestra conciencia nos impide avalar tal proceder.

Y es que las leyes aquí en controversia buscan beneficiar, **injustificadamente**, al partido político en el poder, al permitirle utilizar fondos públicos para fines privados; entiéndase, para adelantar sus posturas en cuanto al estatus político y la relación de Puerto Rico con los Estados Unidos. Dicho proceder, a todas luces, es contrario a lo dispuesto en la Constitución del Estado Libre Asociado de Puerto Rico, en la Constitución de Estados Unidos y en su respectiva jurisprudencia interpretativa.

Como si lo anterior no fuera suficiente, la conclusión que hoy adopta esta Curia es un nuevo episodio del constante atropello al derecho constitucional de los electores a ejercer su derecho al voto libre de coacción por parte del Estado, y en igualdad de condiciones, pues, en esta ocasión, se les impide promover sus propias posturas e ideologías en lo referente al estatus del País, como lo pueden ser el Estado Libre Asociado o la Independencia. Éstas, sin lugar a dudas, no están contempladas en un plebiscito *Estadidad, "Sí o No"*.

Recordemos que todos los eventos electorales deben tener como elemento común el "convocar al pueblo para que mediante el ejercicio del voto se expresen sobre un tema trascendental". *Burgos Andújar v. Com. Estatal de Elecciones*, *supra*, pág. 993 (Colón Pérez, opinión disidente). No podemos ser selectivos en cuanto al sector del electorado que

decidamos convocar a la hora de celebrar eventos electorales de trascendental importancia, tal cual lo es un plebiscito sobre el estatus político futuro de nuestro País.

Convocar a un solo sector de la población que se identifica con una sola de las varias opciones de estatus político que se reconocen -- en esta ocasión, la Estadidad --, a todas luces, socava los pilares de la democracia sobre los cuales se erigió nuestra Constitución. **¿A dónde fue a parar la máxima constitucional de que el poder político del Estado Libre Asociado de Puerto Rico emana del Pueblo y se ejercerá con arreglo a su voluntad y dentro de los términos del convenio acordado entre nuestro Pueblo y los Estados Unidos de América?** CONST. ELA art. I, § 1, LPRA, Tomo 1.

En fin, como últimos intérpretes de la Constitución del Estado Libre Asociado de Puerto Rico, es nuestra función velar por el fiel cumplimiento de la misma y, en cuanto al derecho al sufragio se refiere, procurar que los procesos electorales que se celebren en nuestra jurisdicción garanticen la igualdad de condiciones tanto de los electores como de los partidos políticos que en las mismas participen. Mediante esta Opinión Disidente, quien suscribe entiende cumplió con su deber.

IX.

Es, pues, por los fundamentos antes expuestos, que enérgicamente disentimos del lamentable proceder de la Mayoría de este Tribunal en el día de hoy.

Ángel Colón Pérez
Juez Asociado